IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ASSOCIATED BUILDERS AND CONTRACTORS, EASTERN PENNSYLVANIA CHAPTER, INC., THE ALFERO COMPANY, INC., R.L. REPPERT, INC., and NICK ALFERO, | : : : : : : | |
| Plaintiffs, | : : | CIVIL ACTION NO. 18-2552 |
| v. | : : | |
| COUNTY OF NORTHAMPTON, | : : | |
| Defendant. | : : | |
| ASSOCIATED BUILDERS AND CONTRACTORS, EASTERN PENNSYLVANIA CHAPTER, INC., VELLNIECE CONSTRUCTION, LLC, and JEANETTE TENNANT, | : : : : : : | |
| Plaintiffs, | : : | CIVIL ACTION NO. 18-3907 |
| v. | : : | |
| THE COLONIAL SCHOOL DISTRICT, | : : | |
| Defendant. | : : | |
| ASSOCIATED BUILDERS AND CONTRACTORS, EASTERN PENNSYLVANIA CHAPTER, INC., VELLNIECE CONSTRUCTION, LLC, and JEANETTE TENNANT, | : : : : : : | |
| Plaintiffs, | : : | CIVIL ACTION NO. 18-3908 |
| v. | : : | |
| PLYMOUTH TOWNSHIP, | : : | |
| Defendant. | : : | |

ASSOCIATED BUILDERS AND          :
CONTRACTORS, EASTERN             :
PENNSYLVANIA CHAPTER, INC., and  :
VELLNIECE CONSTRUCTION, LLC,     :
                                 :
                Plaintiffs,      :          CIVIL ACTION NO. 18-4536
                                 :
        v.                       :
                                 :
TOWNSHIP OF WEST NORRITON,       :
                                 :
                Defendant.       :
                                 :

## MEMORANDUM OPINION

Smith, J.                                                          April 25, 2019

  Four municipalities recently passed responsible contractor ordinances which specify certain criteria that a contractor must satisfy to be eligible to perform work valued over a certain monetary threshold for those municipalities. The plaintiffs, the local chapter of a national trade association in the construction industry and affiliated contractors and taxpayers, have brought separate actions against the municipalities in which they allege the responsible contractor ordinances run afoul of federal and state law. Specifically, they claim that the ordinances' requirement that all bidders on qualifying public works projects participate in a so-called "Class A Apprenticeship Program" is a pretext to favor unionized contractors, at the expense of their non-union competitors and taxpayers. The plaintiffs seek relief under the Fourteenth Amendment's Equal Protection and Due Process Clauses, arguing that the apprenticeship-program-participation requirement is not rationally related to any legitimate government purpose. The plaintiffs also claim that the ordinances violate Pennsylvania's public bidding law because the apprenticeship-program-participation requirement is unreasonable, unnecessary, and unfair. Lastly, the plaintiffs

argue that the Employment Retirement Income Security Act ("ERISA" or the "Act") preempts the ordinances as they "relate to" plans covered under the Act.

The court previously granted the defendants' motions to dismiss and allowed the plaintiffs to file amended complaints that included additional facts about the defendants' purported pretext. The plaintiffs filed the amended complaints, and the defendants have now filed four separate motions to dismiss and motions to strike allegations relating to the influence of "corrupt labor officials" on the enactment of the ordinances.

Regarding the motions to dismiss, the defendants argue that the amended complaints fail because the facially-neutral ordinances withstand rational basis review. They assert that the plaintiffs have pled no facts that cast doubt on the conceivability of the purported purpose for the ordinances: ensuring that only responsible, qualified firms and craftspeople work on public construction and maintenance projects. The defendants further argue that the plaintiffs do not have standing to assert the Pennsylvania state law claims and that even if they did have standing, those claims are not yet ripe. Even if the plaintiffs could rightly assert the state law claims, the defendants argue the complaints still fail because the plaintiffs have alleged no facts demonstrating an improper basis for the apprenticeship-program-participation requirement. Lastly, the defendants argue that ERISA does not preempt the ordinances because they are not "related to" covered plans under current Supreme Court and Third Circuit jurisprudence, and even if they were so related, the market participant exception would apply.

The key question for the court to answer concerning the motions to dismiss is whether the plaintiffs are entitled to discovery into what they claim is the true basis for the ordinances and into whether a rational relationship exists between the apprenticeship-program-participation requirement and the defendants' purported interest in ensuring only qualified contractors and their

employees work on public jobs. The court holds that the plaintiffs' pretext argument is insufficient to warrant these actions moving forward, because the purported state interest is conceivably rational on its face and the plaintiffs have pled no facts to suggest it could not have been the defendants' true purpose in passing the ordinances. Moreover, the court agrees with the defendants that ERISA does not preempt the ordinances because they do not "refer to" or have a "connection with" ERISA-covered plans under the Supreme Court's holding in *California Division of Labor Standards Enforcement v. Dillingham Construction, N.A., Inc.*, 519 U.S. 316 (1997), and even if they did, the market participant exception would preclude preemption here.

The court will dismiss with prejudice the plaintiffs' claims under ERISA and the Due Process and Equal Protection Clauses of the Fourteenth Amendment. Having dismissed these federal claims on the merits, the court does not have an independent basis to exercise jurisdiction over the Pennsylvania public bidding law and other state law claims and declines to exercise supplemental jurisdiction over those claims. Additionally, while the court recognizes the issues the defendants have with the allegations forming the basis of their motions to strike, those challenged allegations are not so unrelated to the other allegations in the complaints to warrant striking them under the stringent standard established for doing so.

## I.     PROCEDURAL HISTORY

The plaintiffs, Associated Builders and Contractors, Eastern Pennsylvania Chapter, Inc. and associated individuals and entities, commenced four lawsuits by filing complaints against the County of Northampton, the Colonial School District, Plymouth Township, and the Township of West Norriton between June 18, 2018 and October 22, 2018. These cases presented virtually identical legal issues, and so the court elected to proceed with the cases together unless and until

discrepancies justified proceeding separately. That said, while the actions overlap in substance, each has a unique procedural background, which the court outlines separately below.

## A. <u>County of Northampton</u>[1]

Associated Builders and Contractors, Eastern Pennsylvania Chapter, Inc. ("Associated Builders"), the Alfero Company, Inc., R.L. Reppert, Inc. ("Reppert"), and Nick Alfero filed suit against the County of Northampton ("Northampton") on June 18, 2018. Doc. No. 1. The same day, the plaintiffs filed a motion for a temporary restraining order and preliminary injunction. Doc. No. 3. The court denied the motion for a temporary restraining order as moot in light of Northampton's agreement not to bid out any construction contracts large enough to implicate the challenged ordinance pending final disposition of the case. Doc. No. 9. The court also gave the parties a limited period to conduct all discovery relating to the motion for a preliminary injunction and set a schedule for briefing and a hearing on the motion. *Id.* Northampton answered the complaint on July 9, 2018. Doc. No. 10. After consulting with the parties, the court stayed all deadlines relating to discovery deadlines and the preliminary injunction hearing, upon Northampton's continued representation that it would not bid out jobs implicating the ordinance while litigation was pending. Doc. No. 15.

The court held a consolidated hearing on the other defendants' motions to dismiss on January 3, 2019, following which the court dismissed the complaints in the other actions without prejudice to the plaintiffs filing amended complaints. Civ. A. No. 18-3907, Doc. No. 26; Civ. A. No. 18-3908, Doc. No. 25; Civ. A. No. 18-4536, Doc. No. 14. The plaintiffs then filed amended complaints in all actions, including Northampton's, on February 19, 2019. Civ. A. No. 18-2552,

---

[1] Unless otherwise specified, all docket numbers in this section refer to Civil Action No. 18-2552.

Doc. No. 31 ("Northampton Compl."); Civ. A. No. 18-3907, Doc. No. 30 ("Colonial Compl.");[2] Civ. A. No. 18-3908, Doc. No. 30 ("Plymouth Compl."); Civ. A. No. 18-4536, Doc. No. 19 ("West Norriton Compl."). Northampton filed the instant motion to dismiss the amended complaint on March 11, 2019. Doc. No. 37. The plaintiffs filed a consolidated response in opposition to all the defendants' motions to dismiss on March 25, 2009. Doc. No. 42 ("Opp. to Mot. to Dismiss"). Northampton filed a reply in further support of the motion on March 29, 2019. Doc. No. 43. The court heard oral argument on all the defendants' motions to dismiss on April 3, 2019, and the plaintiffs filed supplemental briefing in response to points made at oral argument on April 4, 2019. Doc. No. 45 ("Suppl. Opp. to Mot. to Dismiss"). The motion to dismiss the amended complaint is now ripe.

## B.     The Colonial School District[3]

Associated Builders, Vellniece Construction, LLC ("Vellniece"), Jeanette Tennant ("Tennant"), and Kim Pennington ("Pennington") filed a complaint against the Colonial School District ("Colonial") on September 11, 2018. Doc. No. 1. The plaintiffs filed a motion for a temporary restraining order and preliminary injunction the next day. Doc. No. 4. On September 18, 2018, before Colonial answered, the plaintiffs filed an amended complaint removing Pennington as a plaintiff. Doc. No. 6. Colonial moved to dismiss the complaint on November 23, 2018. Doc. No. 21. The plaintiffs filed a response in opposition on December 10, 2018, Doc. No. 23, and Colonial filed a response in further support on December 20, 2018. Doc. No. 24. Following oral argument, the court granted the motion to dismiss without prejudice to the plaintiffs filing a second amended complaint. Doc. No. 26.

---

[2] As indicated below, the amended complaint filed in Civil Action No. 18-3907 and referenced throughout this opinion was a second amended complaint.

[3] All docket numbers in this section refer to Civil Action No. 18-3907.

The plaintiffs filed a second amended complaint on February 19, 2019, which removed Tennant and re-added Pennington as plaintiffs. Doc. No. 31. The court then issued an order denying the motion for a temporary restraining order or preliminary injunction as moot, in light of the plaintiffs again amending their complaint. Doc. No. 36. Colonial moved to dismiss the second amended complaint and to strike scandalous allegations on March 11, 2019. Doc. No. 38. The plaintiffs filed the consolidated response in opposition on March 25, 2009. Doc. No. 42. The court heard oral argument on all the defendants' motions to dismiss on April 3, 2019 and the plaintiffs filed supplemental briefing in response to points made at oral argument on April 4, 2019. Doc. No. 44. The motion to dismiss the second amended complaint is now ripe.

## C.     Plymouth Township[4]

Associated Builders, Vellniece, Tennant, and Pennington filed a complaint against Plymouth Township ("Plymouth") on September 11, 2018. Doc. No. 1. The plaintiffs filed a motion for a temporary restraining order and preliminary injunction the next day. Doc. No. 3. On October 19, 2018, the parties filed a joint stipulation, under which Plymouth agreed to suspend enforcement of the challenged policy until October 31, 2019. Doc. No. 13. Per the parties' stipulation, the court denied the motion for a temporary restraining order as moot. Doc. No. 14. Plymouth then moved to dismiss the complaint. Doc. No. 15. The plaintiffs filed a response in opposition on November 5, 2018, Doc. No. 18, and Plymouth filed a reply in further support on November 12, 2018, Doc. No. 19. Following oral argument, the court dismissed the complaint without prejudice. Doc. No. 25.

The plaintiffs filed an amended complaint, removing Tennant as a plaintiff, on February 19, 2019. Doc. No. 30. Plymouth moved to dismiss the amended complaint and to strike

---

[4] Unless otherwise specified, all document numbers in this section refer to Civil Action No. 18-3908.

scandalous allegations on March 1, 2019. Doc. No. 32. The plaintiffs filed the consolidated response in opposition on March 25, 2009. Doc. No. 39. Colonial filed a reply in further support of the motion on March 29, 2019. Doc. No. 40. The court heard oral argument on all the defendants' motions to dismiss on April 3, 2019, and the plaintiffs filed supplemental briefing in response to points made at oral argument on April 4, 2019. Doc. No. 44. The motion to dismiss the amended complaint is now ripe.

### D.      Township of West Norriton[5]

Associated Builders and Vellniece filed a complaint against the Township of West Norriton ("West Norriton") on October 22, 2018. Doc. No. 1. The same day, the plaintiffs filed a motion for a temporary restraining order and to schedule a preliminary injunction hearing. Doc. No. 2. West Norriton filed a response in opposition to the motion for injunctive relief on November 16, 2018. Doc. No. 8. West Norriton then filed a motion to dismiss the complaint on November 21, 2019. Doc. No. 9. The plaintiffs filed a response in opposition to the motion to dismiss on December 10, 2018, Doc. No. 11, and West Norriton filed a reply in further support on December 17, 2018, Doc. No. 12. Following oral argument, the court granted the motion to dismiss without prejudice to the plaintiffs filing an amended complaint. Doc. No. 15.

The plaintiffs filed an amended complaint on February 19, 2019. Doc. No. 19. West Norriton moved to dismiss the amended complaint and to strike impertinent, scandalous matter on February 26, 2019. Doc. No. 20. The court then issued an order denying the motion for a temporary restraining order or preliminary injunction as moot, in light of the plaintiffs amending their complaint. Doc. No. 24. The plaintiffs filed the consolidated response in opposition to the motions to dismiss on March 25, 2009. Doc. No. 29. The court heard oral argument on all the defendants'

---

[5] Unless otherwise specified, the document numbers in this section refer to Civil Action No. 18-4536.

motions to dismiss on April 3, 2019, and the plaintiffs filed supplemental briefing in response to points made at oral argument on April 4, 2019. Doc. No. 31. The motion to dismiss the amended complaint is now ripe.

## II.    FACTUAL ALLEGATIONS

The factual allegations in each of the operative complaints are essentially identical for purposes of resolving the instant motions. Associated Builders is the Eastern Pennsylvania chapter of a national trade association that represents approximately 22,000 chapter members in the construction industry. *See* Northampton Compl. at ¶ 23; Colonial Compl. at ¶ 23; Plymouth Compl. at ¶ 22; West Norriton Compl. at ¶ 22. Alfero Company is an Easton, Pennsylvania-based general contractor, which has successfully performed work on public works projects in Pennsylvania for more than four decades. *See* Northampton Compl. at ¶ 1. Nick Alfero is a citizen and taxpayer of Northampton County. *See id*. at ¶ 26. Reppert is a commercial wall and ceiling contractor, which has successfully performed public works projects in Pennsylvania for over forty years. *See id*. at ¶ 2. Neither Alfero Company nor Reppert has any contractual relationship with a union. *See id*. at ¶ 3. None of Alfero Company's craft workers have graduated from a formal apprenticeship training program and only six of Reppert's current employees have participated in an apprenticeship training program. *See id*. at ¶ 6. Instead, their employees "received their training from years of on-the-job work experience and/or by attending vocational technical schools," which the plaintiffs allege makes them "just as qualified or more qualified than contractors with union agreements." *Id*. at ¶¶ 6–8.

Vellniece is a Glenside, Pennsylvania-based general contractor that exclusively performs publicly-funded construction work, almost entirely in Pennsylvania. *See* Colonial Compl. at ¶¶ 1, 24; Plymouth Compl. at ¶¶ 1, 23; West Norriton Compl. at ¶¶ 1, 23. Vellniece employs

approximately eighteen employees, including qualified, skilled craft workers. *See* Colonial Compl. at ¶ 3; Plymouth Compl. at ¶ 3, West Norriton Compl. at ¶ 3. Those employees have not graduated from formal apprenticeship programs but instead "received their training from years of on-the-job work experience and/or by attending vocational technical schools," which render them "just as qualified or more qualified than workers employed by union contractors." Colonial Compl. at ¶¶ 5–6; Plymouth Compl. at ¶¶ 5–6, West Norriton Compl. at ¶¶ 5–6. Pennington is a citizen and taxpayer of Colonial and Plymouth. *See* Colonial Compl. at ¶ 25; Plymouth Compl. at ¶ 24.

In October 2018, the Northampton County Council enacted a "Responsible Contractor Ordinance" ("RCO"), which requires contractors bidding on public works in the county valued at or above $250,000 to participate in a "Class A Apprenticeship Program, . . . for each separate trade or classification in which it employs craft employees." Northampton Compl. at ¶ 38 (internal quotation marks omitted). A Class A program is one that has received approval from the United States Department of Labor or a state apprenticeship agency and has been in continuous existence for at least five years. *See id.* at ¶ 39. The County Council's stated purpose for the RCO is to "ensure that all work on public construction and maintenance contracts is performed by responsible, qualified firms . . . ." *See id.* at ¶ 41 (internal quotation marks omitted).

Colonial passed its Responsible Contractor Policy[6] in August 2018, which requires bidding contractors to participate in a Class A Apprenticeship Program for projects valued at or above $500,000. *See* Colonial Compl. at ¶ 37. Colonial's RCO also requires the bidder's apprenticeship program to have received approval from the United States Department of Labor or a state apprenticeship agency and graduated apprentices to journey person status for at least two of the

---

[6] For the sake of simplicity, the court refers to all the challenged policies together as the RCOs, even though Colonial's policy is technically a policy rather than an ordinance. The complaints do not attach any significance to the names of each individual policy.

prior seven years, unless the program was registered within the last ten years. *See id.* at ¶ 38. The stated purpose of the RCO is to "ensure that all work on public construction and maintenance contracts is performed by responsible, qualified firms . . . ." *See id.* at ¶ 40 (internal quotation marks omitted).

Also in August, 2018, the Plymouth Town Council passed its RCO, which applies to all public projects valued at $150,000 or more and requires public works bidders to have a Class A Apprenticeship Program that has received approval from the United States Department of Labor or a state apprenticeship agency and graduated apprentices to journey person status for a minimum of three of the prior five years. *See* Plymouth Compl. at ¶¶ 36–37. The bidding contractor must have been registered in that program for the past three years for each trade or classification its craft employees practice. *See id.* The stated purpose of the RCO is to "ensure that all work on public construction and maintenance contracts is performed by responsible, qualified firms . . . ." *Id.* at ¶ 38 (internal quotation marks omitted).

Lastly, also in August 2018, the Board of Commissioners of the Township of West Norriton passed a RCO requiring bidding contractors to certify participation in a Class A Apprenticeship Program for each trade or classification in which its craft employees engage. *See* West Norriton Compl. at ¶ 34. The West Norriton RCO mandates that a qualifying apprenticeship program receive approval from the United States Department of Labor or a state apprenticeship agency and have graduated apprentices to journey person status in at least two of the prior seven years, except for programs registered within the last ten years. *See id.* at ¶ 35. The RCO applies to projects valued at or above $250,000. *See id.* at ¶ 34. Again, the RCO's stated purpose is to "ensure

that all work on public construction and maintenance contracts is performed by responsible, qualified firms . . . ." *Id.* at ¶ 37 (internal quotation marks omitted).[7]

The plaintiffs assert that the stated purpose of all the RCOs is "100% false, irrational, arbitrary, and capricious." Northampton Compl. at ¶ 41; Colonial Compl. at ¶ 40; Plymouth

[7] Northampton's RCO states: "This apprenticeship requirement assures that workers in each trade or craft employed are graduates of an apprenticeship and training program in each trade or craft in which their services are utilized, which has been in continuous existence for no fewer than five (5) years prior to the commencement of the subject project." Compl., Ex. A at ECF p. 4, Civ. A. No. 18-2552, Doc. No. 1-1 ("Northampton RCO").

Colonial's RCO states: "This policy is intended to ensure that all work on public construction and maintenance contracts is performed by responsible, qualified firms that maintain the capacity, expertise, personnel and other qualifications and resources necessary to successfully perform District contracts in a timely, reliable and cost-effective manner by establishing clearly defined, minimum standards relating to contractor responsibility . . . ." Mem. of Law in Supp. of Colonial Sch. Dist.'s Mot. to Dismiss Second Am. Compl. and to Strike Scandalous Allegations ("Colonial Mem."), Ex. A at ECF p. 2, Civ. A. No. 18-3907, Doc. No. 38-3 ("Colonial RCO").

Plymouth's RCO states:

> The Council of Plymouth Township recognizes that there is a need to ensure that all work on public construction and maintenance contracts is performed by responsible, qualified firms that maintain the capacity, expertise, personnel and other qualifications and resources necessary to successfully perform public contracts in a timely, reliable and cost-effective manner.
>
> To effectuate the purpose of selecting responsible contractors for public contracts and to protect Plymouth Township's investments in such contracts, prospective contractors and sub-contractors[] should be required to meet pre-established, clearly defined, minimum standards relating to contractor responsibility, including requirements and criteria concerning technical qualifications, competency, experience, adequacy of resources, including equipment, financial and personnel, and satisfactory records regarding past project performance, safety, law compliance and business integrity.

Mem. of Law in Supp. of Mot. for TRO and Prelim. Inj., Ex. A. at ECF p. 2, Civ. A. No. 18-3908, Doc. No. 3-4 ("Plymouth RCO").

West Norriton's RCO states:

> Further, due to the critical impact that skilled construction craft labor has on public works projects, and due to the limited availability of skilled construction craft labor and imminent craft labor skill shortages, it is necessary to require contractors and subcontractors to participate in established, formal apprenticeship training programs as a condition of bidding, for the purpose of both promoting successful project delivery and ensuring future workforce development. West Norriton also recognizes that it is beneficial to the local community to ensure that firms receiving public contracts provide adequate wages and benefits to their employees and utilize fair business, employment and training practices that have a positive impact on local communities affected by such contracts.

Def., West Norriton Twp.'s Mem. of Law in Supp. of Moving Def.'s Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) ("West Norriton Mem."), Ex. B at ECF p. 29, Civ. A. No. 18-4536, Doc. No. 20-1 ("West Norriton RCO").

The court notes that the plaintiffs did not attach any of the RCO's to the operative complaints, but it is nonetheless proper for the court to consider them as "matters of public record and documents integral to or relied upon in the complaint." *Plaza at 835 W. Hamilton St. LP v. Allentown Neighborhood Improvement Zone Dev. Auth.*, Civ. A. No. 15-6616, 2017 WL 4049237, at *2 n.6 (E.D. Pa. Sept. 12, 2017) (citing *Sands v. McCormick*, 512 F.3d 263, 268 (3d Cir. 2007); *Pryor v. NCAA*, 288 F.3d 548, 560 (3d Cir. 2002)).

Compl. at ¶ 38; West Norriton Compl. at ¶ 37. The heart of the plaintiff's allegations is that "corrupt" union bosses "hate" non-union contractors such as themselves and believe that public works projects "are the union's turf[, which] they are desperate to protect[.]" Northampton Compl. at ¶¶ 9–10; Colonial Compl. at ¶¶ 8–9, Plymouth Compl. at ¶¶ 8–9, West Norriton Compl. at ¶¶ 8–9.[8] They then claim that these corrupt union bosses "championed" the RCOs through the relevant legislative bodies, in a supposed effort to ensure that the unions' "turf" is protected. *See* Northampton Compl. at ¶¶ 10–11; Plymouth Compl. at ¶¶ 9–10, West Norriton Compl. at ¶¶ 9–10. Regarding Colonial, the plaintiffs allege that Raimondo, who is employed by a union contractor, "[w]ork[ed] hand-in-hand with corrupt union bosses [] without first consulting with other members of the District's Board" to draft the RCO. Colonial Compl. at ¶ 11.[9]

None of the complaints include any facts concerning how these unnamed union bosses pushed the challenged policies, but instead rely on what they purport is a connection between the challenged policies and the purportedly pro-union agenda: "Virtually all" union contractors participate in a Class A Apprenticeship Program—even though they do not necessary employ workers who are currently enrolled in or have already graduated the program—while many non-union, or "merit shop," contractors do not. *See* Northampton Compl. at ¶¶ 13–14; Colonial Compl. at ¶¶ 13–14; Plymouth Compl. at ¶¶ 12–13; West Norriton Compl. at ¶¶ 12–13. Thus, the plaintiffs

---

[8] The only "corrupt union boss" whom the plaintiffs identify is John J. Dougherty, Business Manager of the International Brotherhood of Electrical Workers ("IBEW"), Local 98. *See* Northampton Compl. at ¶¶ 9, 10; Colonial Compl. at ¶¶ 8, 9; Plymouth Compl. at ¶¶ 8, 9; West Norriton Compl. at ¶¶ 8, 9. The plaintiffs direct the court to the docket in Mr. Dougherty's criminal case, in which he and others are accused of a conspiracy to embezzle union funds and to bribe Philadelphia City Council officials. *See generally* Indictment, *United States v. Dougherty*, No. 19-cr-64, Doc. No. 1. Nowhere do any of the complaints allege any connection between Mr. Dougherty or his affiliates and any of the defendants in these cases, other than to allege that Colonial School Board President Felix Raimondo ("Raimondo") is employed by an unnamed IBEW contractor. *See* Colonial Compl. at ¶ 10. The allegations that Raimondo "[w]ork[ed] in the shadows [with] corrupt union bosses . . . to do the unions' bidding" is wholly conclusory, *id.* at ¶ 10, and counsel for plaintiffs could not point to any source for those allegations at oral argument.

[9] The complaint does not explain how Raimondo then convinced a majority of the School Board to support this back-door policy.

13

allege the RCOs will "ensure[] that non-union or merit-shop contractors will be precluded from being awarded public works projects in favor of union contractors," and "[i]t is clear that the RCO[s are] not grounded in any rational justification, but w[ere] crafted to benefit politically powerful and corrupt labor organizations and their contractor signatories." Northampton Compl. at ¶¶ 52, 55; Colonial Compl. at ¶¶ 51, 54; Plymouth Compl. at ¶¶ 49, 52; West Norriton Compl. at ¶¶ 48, 51. This, in turn, harms the public's "ability to derive the best quality and value in the performance of public works projects that are financed with its tax dollars." Northampton Compl. at ¶ 56; Colonial Compl. at ¶ 55; Plymouth Compl. at ¶ 53; West Norriton Compl. at ¶ 52.

The plaintiffs allege that the RCOs' purported failure to ensure that union employees actually completed the required apprenticeship programs divorce the RCOs from their stated purposes. *See* Northampton Compl. at ¶ 16; Colonial Compl. at ¶ 16; Plymouth Compl. at ¶ 15; West Norriton Compl. at ¶ 15. The plaintiffs further challenge that "[t]he act of signing a collective bargaining agreement and becoming a union contractor would, in and of itself, *magically* convert [the plaintiffs] from [] unqualified contractor[s] into [] 'responsible' contractor[s] under the [ordinances]." Colonial Compl. at ¶ 18; *see* West Norriton Compl. at ¶ 17 (same); *see also* Northampton Compl. at ¶ 18 ("Thus, the act of signing a collective bargaining agreement and becoming a union contractor and remaining such for three (3) years would, in and of itself, *magically* and *instantaneously* render Alfero Company's and Reppert's employees trained, skilled, and eligible to perform work on public works projects for the County without any of these employees enrolling in or ever having participated in any formal apprenticeship training program."); Plymouth Compl. at ¶ 17 ("Thus, the act of signing a collective bargaining agreement and becoming a union contractor and remaining such for three (3) years would, in and of itself, *magically* and *instantaneously* render Vellniece's eighteen (18) employees trained, skilled, and

eligible to perform work on public works projects for the Township without any of these employees enrolling in or ever having participated in any formal apprenticeship training program."). Inversely, a union contractor who decided to terminate its union membership "would *magically* and *instantaneously* be converted from a 'responsible' contractor' to an ineligible contractor," even if all of its employees had graduated from a qualified apprenticeship program. Northampton Compl. at ¶ 19; Colonial Compl. at ¶ 19; Plymouth Compl. at ¶ 18; West Norriton Compl. at ¶ 18.

The plaintiffs appended to the amended complaints the affidavit of their purported expert, Anirban Basu.[10] *See* Northampton Compl., Ex. A at ECF pp. 24–27, Doc. No. 31; Colonial Compl. Ex. A at ECF pp. 23–26, Doc. No. 30; Plymouth Compl., Ex. A at ECF pp. 23–26, Doc. No. 30; West Norriton Compl., Ex. A at ECF pp. 22–25, Doc. No. 19.[11] The affidavit echoes the complaints' allegation that the apprenticeship-program-participation requirement "is mere pretext, designed to benefit a politically favored element of the region's construction industry at the expense of another." Basu Aff. at 1. Mr. Basu acknowledges that "apprenticeships represent an important source of human capital formation," but disputes that any "one form of apprenticeship program is superior [to] another." *Id*. at 2. He then concludes:

> While some workers at a limited number of firms would enjoy plentiful opportunities to refine their skills, another group would be left behind, potentially losing the opportunity for gainful careers. This would merely serve to exacerbate the skills shortages presently plaguing the Philadelphia area and national construction industries. It would also translate into a smaller middle class, which would contribute to already large income and wealth inequalities regionally and nationally. That is hardly equal treatment. Nor is it sound public policy rooted in rationality.

---

[10] The affidavit provides no information about Mr. Basu's background or why he is qualified to opine on these matters.
[11] The affidavits attached to all four complaints are identical, so for the sake of simplicity the court will refer to the document as the "Basu Aff." rather than distinguishing by action.

*Id.* Lastly, Mr. Basu asserts that the RCOs will harm taxpayers by allowing "fewer firms [] to bid on contracts and [] fewer workers [to be] trained and available to work productively on public projects," thus making the average public project more expensive. *Id.* at 3. This would then lead to "fewer public construction projects [being] delivered since each individual project would account for a larger share of public capital budgets." *Id.*

The plaintiffs allege that these discrepancies between the RCOs' stated purpose and the apprenticeship-program-participation requirement amount to a violation of their Fourteenth Amendment constitutional rights to equal protection and due process of law. *See* Northampton Compl. at ¶¶ 70–79; Colonial Compl. at ¶¶ 67–76; Plymouth Compl. at ¶¶ 65–74; West Norriton Compl. at ¶¶ 64–73. They further contend that the RCO's violate Pennsylvania public bidding laws by implementing unfair requirements that are unreasonable and unnecessary to determine who is a responsible bidder. *See* Northampton Compl. at ¶¶ 57–69; Colonial Compl. at ¶¶ 56–66; Plymouth Compl. at ¶¶ 54–64; West Norriton Compl. at ¶¶ 53–63. Lastly, the plaintiffs claim that ERISA preempts the RCOs because they "relate to" ERISA-covered plans for purposes of the Act. *See* Northampton Compl. at ¶¶ 80–85; Colonial Compl. at ¶¶ 77–82; Plymouth Compl. at ¶¶ 75–80; West Norriton Compl. at ¶¶ 74–78.

## III.  DISCUSSION – MOTIONS TO DISMISS

### A.  <u>Standard of Review – Motion to Dismiss Under Rule 12(b)(6)</u>

Federal Rule of Civil Procedure 12(b)(6) allows a party to move for dismissal of a complaint or a portion of a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A motion to dismiss under Rule 12(b)(6) tests "the sufficiency of the allegations contained in the complaint." *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993)

(citation omitted). As the moving party, "[t]he defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citation omitted).

In general, a complaint is legally sufficient if it contains "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "The touchstone of [this] pleading standard is plausibility." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012). Although Rule 8(a)(2) does "not require heightened fact pleading of specifics," it does require the recitation of "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). In other words, "[t]he plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quotation omitted). "In ruling on a 12(b)(6) motion, courts can and should reject legal conclusions, unsupported conclusions, unwarranted references, unwarranted deductions, footless conclusions of law, and sweeping legal conclusions in the form of actual allegations." *Bright v. Westmoreland Cty.*, 380 F.3d 729, 735 (3d Cir. 2004) (citation and internal quotation marks omitted). Ultimately, a complaint must contain facts sufficient to nudge any claim "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

### B.     Equal Protection Claims

The Fourteenth Amendment prohibits a state from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Municipalities constitute the state for purposes of Fourteenth Amendment protections. *See, e.g.*, *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989) (evaluating equal protection claim in context of city's

adoption of minority business utilization plan). In applying the Equal Protection Clause, courts will not unnecessarily interfere with the local legislative process, and "[t]he general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985) (citations omitted). "[T]he Court hardly ever strikes down a policy as illegitimate under rational basis scrutiny. On the few occasions [the Court] ha[s] done so, a common thread has been that the laws at issue lack any purpose other than a 'bare ... desire to harm a politically unpopular group.'" *Trump v. Hawaii*, 138 S.Ct. 2392, 2420 (2018) (omission in original) (quoting *Dep't. of Agric. v. Moreno*, 413 U.S. 528, 534 (1973)).

The state is entitled to especially "wide latitude" in the context of social and economic legislation, because "the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes." *City of Cleburne*, 473 U.S. at 440 (internal citations omitted). Therefore, absent a classification based on race, alienage, gender, national origin or a state action that impinges on personal rights, "the courts have been very reluctant, as they should be in our federal system and with our respect for the separation of powers, to closely scrutinize legislative choices as to whether, how, and to what extent those interests should be pursued," and will only require "a rational means to serve a legitimate end." *Id*. at 441–42. A law is consistent with the Equal Protection Clause where

> there is a plausible policy reason for the classification, the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational.

*Armour v. City of Indianapolis*, 566 U.S. 673, 681 (2012) (citation and internal quotation marks omitted). Put simply, an equal protection challenge fails if "at least one of the purposes of the classification involves a legitimate public interest and . . . the classification is rationally related to

achievement of that purpose." *Hancock Indus. v. Schaeffer*, 811 F.2d 225, 237 (3d Cir. 1987) (citing *U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 184 (1980) (Brennan, J., dissenting)).

The plaintiffs do not dispute that ensuring that workers on public construction jobs are adequately trained is a legitimate state interest. Instead, they assert that the stated purpose is a pretext for protecting unionized contractors at the expense of their non-union competitors. *See* Northampton Compl. at ¶ 74 ("The stated rationale for the RCO is merely a pretext for protecting the economic interests of union contractors at the expense of [non-union] merit-shop contractors."); Colonial Compl. at ¶ 71 (same); Plymouth Compl. at ¶ 69 (same); West Norriton Compl. at ¶ 68 (same). They also argue that the RCOs are not rationally related to the purported interest, largely because "the apprenticeship participation requirement set forth in the RCO[s] hinges on whether a contractor participates in a Class A apprenticeship program – as opposed to whether the actual craft workers employed by a contractor have participated in and/or graduated from a Class A apprenticeship training program . . . ." Northampton Compl. at ¶ 43; Colonial Compl. at ¶ 42; Plymouth Compl. at ¶ 40; West Norriton Compl. at ¶ 39. The court addresses each aspect of the equal protection analysis in turn.

### 1.     Identifying the Challenged Classification

Before evaluating whether the challenged government action violates the Equal Protection Clause, the court must first "identify with particularity the precise classification alleged to be irrational." *Murillo v. Bambrick*, 681 F.2d 898, 906 (3d Cir. 1982). On their face, the ordinances challenged here distinguish between contractors that participate in a qualifying apprenticeship program and those that do not, by establishing that only the former may bid on projects to which they apply. *See* Northampton RCO at ECF p. 4; Colonial RCO at ECF p. 4; Plymouth RCO at ECF p. 5; West Norriton RCO at ECF p. 31. However, the plaintiffs argue that the true purpose of the

classification is to distinguish between union and non-union contractors. *See* Opp. to Mot. to Dismiss at 5 ("The true objectives of the RCOs are to promote the pecuniary interests of union contractors at the expense of non-union contractors, and, to muscle non-union contractors into signing collective bargaining agreements so that they can magically be converted into 'responsible contractors.'").

Unfortunately for the plaintiffs, they point to no case law—and the court has found none—that suggests the court may disregard the classification on the face of the statute when a plaintiff alleges the classification is pretextual. It is indisputable that the RCOs are facially neutral as to union membership. Indeed, the plaintiffs conceded at oral argument and in their purported expert affidavit that non-unions can participate in qualifying apprenticeship programs and that Associated Builders, in fact, sponsors such a program.[12] Nonetheless, they argued that Associated Builders' members could not necessarily rely on that program to qualify as responsible bidders, because the RCOs specify that the bidder must participate in an apprenticeship program for each individual trade relevant to the project, and Associated Builders does not sponsor programs for all trades. *See* Northampton RCO at ECF p. 4; Colonial RCO at ECF p. 4; Plymouth RCO ECF p. 5; West Norriton RCO at ECF p. 31. But that argument misses the point: regardless of whether a contractor currently participates in a qualifying apprenticeship program, its non-union status does not prevent it from participating in such a program. To the contrary, a non-union, like Associated Builders, can choose to sponsor an apprenticeship program in any trade. *Cf. Sammon v. N.J. Bd. of Med. Exam'rs*, 66 F.3d 639, 644 (3d Cir. 1995) ("New Jersey's statute does not foreclose anyone from

---

[12] The plaintiffs referred to this program in the original complaints but removed the reference in the amended versions. *See, e.g.*, Sept. 11, 2018 Compl. at ¶ 30, Civ. A. No. 18-3908, Doc. No. 1 ("[Associated Builders] has long been a strong supporter of apprenticeship programs as *one of a number* of training mechanisms that can help improve the skills of construction workers and advance their careers. Indeed, [Associated Builders] sponsors a registered apprenticeship training program for its members.").

obtaining a license to practice, or from practicing, direct entry midwifery so long as that individual meets the qualifications specified in the statute."). The fact that they chose not to do so does not mean that the purported purpose for the RCOs is a pretext to benefit unions.[13]

The plaintiffs allege, at most, a disparate impact on non-unions like themselves. *See* Northampton Compl. at ¶ 92 ("The vast majority, if not all, of the contractors that will be excluded by the RCO[s] from performing public works projects are contractors that are not affiliated with a labor organization."); Colonial Compl. at ¶ 89 (same); Plymouth Compl. at ¶ 87 (same); West Norriton Compl. at ¶ 86 (same). Although a member of a protected class may succeed on a disparate impact claim if the impact can be attributed to a discriminatory purpose, *see Personnel Admin. of Mass. v. Feeney*, 442 U.S. 256, 272 (1979) (hereinafter "*Feeney*") ("[E]ven if a neutral law has a disproportionality adverse effect upon a racial minority, it is unconstitutional under the Equal Protection Clause only if that impact can be traced to a discriminatory purpose."), the parties agree that non-unions are not a protected class entitled to a heightened standard of review. *See* Opp. to Mot. to Dismiss at 6–7 (describing appropriate standard as rational basis). And absent membership in a protected class, mere disparate impact is insufficient to make out a claim. *See In re Am. Family Enters.*, 256 B.R. 377, 426 (D.N.J. 2000) ("Even assuming, *arguendo*, that the $40 threshold has a disparate impact on lower income Class Members, it would not constitute a denial of equal protection, as the threshold has a rational basis . . . ." (citing *Black v. Sec'y of Health & Hum. Servs.*, 93 F.3d 781, 787–89 (Fed. Cir. 1996)). Thus, in reviewing the RCOs, the court deems

---

[13] The plaintiffs took the position at oral argument that some contractors may not be able to afford to participate in a certifying apprenticeship program, but they point to no legal basis for why that should change the analysis of whether the RCOs are rational. To the contrary, the court cannot say that it would be irrational for the defendants to have concerns about contractors who potentially lack the resources necessary to train their employees as the defendants consider necessary for work on public projects.

the relevant classification to be between contractors that participate in a qualifying apprenticeship program and those that do not.[14] The court now turns to the state interest behind that classification.

## 2. Legitimate State Interest

a. Under Rational Basis Review, the Government Need Only Provide a Conceivable Rational Basis for the Legislation

There is no dispute that the stated purpose behind the RCOs—ensuring that only qualified, adequately trained contractors and their employees work on public projects—is a legitimate state interest. *See* Basu Aff. at 1 ("[A]ll stakeholders would agree with the proposition that high quality construction is both desirable and necessary . . . ."). However, the plaintiffs allege that "[t]he stated rationale for the [ordinances] is merely a pretext for protecting the economic interests of union contractors at the expense of [non-union] merit-shop contractors." Northampton Compl. at ¶ 74; Colonial Compl. at ¶ 71; Plymouth Compl. at ¶ 69; West Norriton Compl. at ¶ 68. An allegation in the equal protection context that the government's purported interest is a pretext may succeed under certain circumstances. Specifically, facial neutrality will not protect a statute that "is an obvious pretext for racial discrimination." *Feeney*, 442 U.S. at 272 (citations omitted). Alternatively, "[w]here an equal protection claim is based on selective enforcement of valid laws, a plaintiff can show that the defendants' rational basis for selectively enforcing the law is a pretext for an impermissible motive." *Squaw Valley Dev. Corp. v. Goldberg*, 375 F.3d 936, 944 (9th Cir. 2004), *abrogated on other grounds by Action Apartment Ass'n Inc. v. Santa Monica Rent Control Bd.*, 509 F.3d 1020, 1025 (9th Cir. 2007).

Outside of those contexts, however, a mere allegation of pretext, without more, does not allow the court to disregard the legislature's proffered purpose. *See Archer v. York City Sch. Dist.*,

---

[14] Although not controlling on the court's consideration of the relevant classification, the plaintiffs' pretext argument also is relevant to the court's evaluation of the rational basis underlying the RCOs, as explained further below.

227 F. Supp. 3d 361, 376 (M.D. Pa. 2016) (concluding that plaintiffs' allegations that defendant "targeted" them were "inapposite to . . . rational basis review" because proffered purpose "amount[ed] to a rational basis for the differentiation in treatment that [wa]s beyond mere pretext"); *Bervid v. Alvarez*, 647 F. Supp. 2d 1006, 1013 (N.D. Ill. 2009) (determining that plaintiff's argument that defendant's proffered reason for his termination was pretextual fails "in the constitutional context, where the state need not demonstrate any factual basis to support its classification, so long as some conceivable rational basis exists"); *cf. Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 476 n.2 (hereinafter "*Clover Leaf*") (Powell, J., concurring in part and dissenting in part) (explaining that Commerce Clause analysis differs from rational basis test because "[u]nder the Commerce Clause, a court is empowered to disregard a legislature's statement of purpose if it considers it a pretext" (citation omitted)). Instead, a classification subject to rational basis review "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Commc'ns Inc.*, 508 U.S. 307, 313 (1993) (hereinafter "*Beach Commc'ns*") (citations omitted). That conceivable state of facts "is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *Id.* at 315 (citations omitted); *see also Allied Stores of Ohio, Inc. v. Bowers, Inc.*, 358 U.S. 522, 528 (1959) ("Similarly, it has long been settled that a classification, though discriminatory, is not arbitrary nor violative of the Equal Protection Clause of the Fourteenth Amendment if any state of facts reasonably can be conceived that would sustain it." (citations omitted)); *Murillo*, 681 F.2d at 906 ("[W]e must decide whether or not the New Jersey Legislature rationally *could have* chosen, for example, to impose higher financial obligations upon divorce litigants than on contract litigants." (emphasis added));

*Archer*, 227 F. Supp. 3d at 377 ("Plaintiffs' evidence must indicate that Defendants' actions were not rationally related to *any* legitimate government purpose.").

The plaintiffs argue that the alleged true purpose of the RCOs—support for unions to the exclusion of non-union businesses—is not a legitimate government purpose. But even if that was the true purpose, it is not enough to sustain the plaintiffs' burden under rational basis review. Instead, the plaintiffs would have to show that the purported state purpose—ensuring only qualified craftspeople are employed on public projects—is not even a *conceivable* basis for the ordinances. Thus, the plaintiffs cannot just allege that another purpose of the statute was to benefit unions, or even that the legislators who passed the ordinance only intended to benefit unions. *See Beach Commc'ns*, 508 U.S. at 315 ("[I]t is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature"). Instead, they would have to challenge the conceivability of the defendants' proffered purpose.

The defendants here have identified two purposes behind the RCOs. First, the RCOs aim "to ensure that all work on public construction and maintenance contracts is performed by responsible, qualified firms that maintain the capacity, expertise, personnel and other qualifications and resources necessary to successfully perform District contracts in a timely, reliable and cost-effective manner . . . ." Colonial RCO at ECF p. 2; *see also* Northampton RCO at ECF p. 2 ("All firms engaged in contracts covered by this ordinance shall be qualified, responsible contractors or subcontractors that have sufficient capabilities in all respects to successfully perform contracts on which they are engaged, including the necessary experience, equipment, technical skills and qualifications and organizational, financial and personnel resources."); Plymouth RCO at ECF p. 2 ("[T]here is a need to ensure that all work on public construction and maintenance contracts is performed by responsible, qualified firms that maintain

the capacity, expertise, personnel and other qualifications and resources necessary to successfully perform public contracts in a timely, reliable and cost-effective manner."); West Norriton RCO at ECF p. 29 ("To effectuate the purpose of selecting responsible contractors for public contracts and to protect West Norriton investments in such contracts, prospective contractors and sub-contractors should be required to meet pre-established, clearly defined, minimum standards relating to contractor responsibility . . . ."). Second, the West Norriton RCO cited to skilled labor shortages and asserted that the township "recognize[d] that it is beneficial to the local community to ensure that firms receiving public contracts provide adequate wages and benefits to their employees and utilize fair business, employment and training practices that have a positive impact on local communities affected by such contracts." West Norriton RCO at ECF p. 29.[15] Certainly, governments have a legitimate interest in ensuring the quality of the contractors and workforce hired on public projects. Indeed, Pennsylvania public bidding law itself requires as much: "the question of who is the lowest responsible bidder [for purposes of the Pennsylvania public bidding law] . . . includes financial responsibility, . . . integrity, efficiency, industry, experience, promptness, and ability to successfully carry out the particular undertaking . . . ." *Kratz v. City of Allentown*, 155 A. 116, 117 (Pa. 1931) (citation omitted).

Having recognized that a conceivable legitimate purpose exists for the RCOs, "'[the court's] inquiry [into whether a rational basis exists] is at an end.'" *Hancock Indus.*, 811 F.2d at 237 (first alteration in original) (quoting *U.S. R.R. Ret. Bd.*, 449 U.S. at 179). Nonetheless, in the interest of thoroughness, the court takes this opportunity to explain why the plaintiffs' reliance on the Middle District of Pennsylvania's decision in *Leer Electric Inc. v. Pennsylvania Department of Labor & Industries*, 597 F. Supp. 2d 470 (2009) is misplaced. The plaintiffs claim that *Leer*

---

[15] As the question is whether the legislation has any conceivable basis, and not whether the defendant actually considered that basis, the court can consider West Norriton's second proffered interest as to all defendants.

supports the proposition that where "a legislative enactment intentionally discriminates against a company on the basis of its non-union status without any rational basis, the law violates equal protection." Opp. to Mot. to Dismiss at 9 (citing *Leer*, 597 F. Supp. at 483). *Leer*—which involved enforcement actions, not legislation—addressed allegations that the defendants "maliciously prosecut[ed] [non-unions] simply because [their] employees ha[d] elected to remain non-union as they [we]re entitled under Section 7 of the National Labor Relations Act, 29 U.S.C. § 151, *et. seq*." 597 F. Supp. at 483 (citing to complaint). The defendants did not dispute that they brought enforcement actions against non-unions significantly more often than against unions, but suggested that was because "prevailing wage rates under the Wage Act are set with union wage scales in mind [and so] . . . it would be entirely rational for [the Department of Labor and Industry] to focus its resources on enforcing the Wage Act against non-union contractors[.]" *Id*. (internal quotation marks omitted) (quoting defendants' brief). In that context, the court found that "close examination of detailed facts" would be necessary to determine whether "Defendants br[ought] disbarment proceedings against Plaintiffs simply because they [we]re a non-union contractor, or [if instead] Plaintiff's status as a non-union contractor ma[de] them particularly prone to PWA violations entailing non-discriminatory enforcement efforts by Defendants[.]" *Id*. Thus, that case involved admitted differential treatment between unions and non-unions; the only question was whether a rational basis existed for the defendants' apparently selective enforcement actions against the plaintiffs and others similarly situated. Here, in contrast, the plaintiffs have challenged facially-neutral pieces of legislation that do not reference—implicitly or explicitly—union membership, and they have provided conceivable rational bases for the RCOs that are entirely

unrelated to union membership.[16] Therefore, *Leer* is wholly inapplicable to the court's determination of whether a conceivable rational basis exists for the RCO.

The plaintiffs also rely on cases from outside of the Third Circuit holding that economic discrimination against certain types of businesses and economic protectionism are not legitimate state purposes, but none of those cases are applicable here. *See* Opp. to Mot. to Dismiss at 9–10. In *Bruner v. Zawacki*, the Eastern District of Kentucky held that the defendant's policy of allowing existing moving companies a "competitor's veto" to exclude new entrants to the market was unconstitutional, because the existing companies could "veto competitors from entering the moving business for any reason at all, completely unrelated to safety or societal costs" and there was therefore "no link between the protest and hearing procedures and any alleged government interest in health and safety." 997 F. Supp. 2d 691, 700 (E.D. Ky. 2014) (citation and internal quotation marks omitted); *see also Craigmiles v. Giles*, 312 F.3d 220, 225 (6th Cir. 2002) (holding health and safety interest was not rationally related to licensing requirements for casket sellers because sellers were not handling bodies and licensed funeral directors were not obligated to sell higher quality caskets). Thus, both *Bruner* and *Craigmiles* involved proffered rational bases that were inconceivable on their faces. Here, in contrast, the defendants' explanation that participation in a certified apprenticeship program, *i.e.,* a program approved by the federal or state government to train craftspeople, is more likely to ensure workers on public projects are adequately trained is inherently reasonable. *See Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 216 (3d Cir. 2013) (affirming district court's grant of motion to dismiss because assumptions underlying school actions were "reasonable"). Likewise, *City of Philadelphia v. New Jersey*, 437 U.S. 617 (1978) does not support the plaintiffs' position. That case addressed the Commerce Clause's prohibition

---

[16] The court did not discuss in *Leer* the conceivable rational basis standard applicable to challenged legislation.

against a state discriminating against another state's businesses; it did not apply—or even reference—equal protection or due process. *See generally* 437 U.S. at 621–29.

b.    Because a Conceivable Rational Basis is Enough to Defeat an Equal Protection Claim, the Court Generally Will Not Inquire into the Government Decisionmaker's Intent

As the court may sustain a classification on any conceivably rational basis, it follows that the legislators' actual intent in passing the challenged legislation is generally irrelevant for equal protection purposes. The court will only inquire deeper where circumstances suggest that the legislators could not possibly have been motivated by the proffered purpose:

> [T]he court has no occasion to inquire into the subjective motives of the decisionmakers. The court accepts at face value contemporaneous declarations of the legislative purposes, or, in the absence thereof, rationales constructed after the fact, unless an examination of the circumstances *forces the court to conclude that they could not have been a goal of the legislation*. Thus, where there are plausible reasons for the legislative action, the court's inquiry is at an end. It is, of course, constitutionally irrelevant whether this reasoning in fact underlay the legislative decision.

*Hancock Indus.*, 811 F.2d at 237–38 (internal quotation marks, citations, and alterations omitted) (emphasis added). The Supreme Court has recognized the implausibility of a proffered government interest where discrepancies are clear from the legislative history or the statute itself.

For instance, in *Clover Leaf*, the plaintiffs argued that the proffered state interest "'could not have been a goal of the legislation'" because of what the plaintiffs perceived to be inconsistent statements in the legislative history. 449 U.S. at 463 n.7 (quoting *Weinberger v. Wiesenfeld*, 420 U.S. 636, 648 n.16 (1975)). The Court rejected that argument and held that the legislative history, in fact, confirmed the veracity of the government's claimed purpose. *See id*. More importantly, the Court decried the lower courts' substitution of their own judgments for the legislature's in invalidating the law as a "patent violation of the principles governing rationality analysis under

the Equal Protection Clause," under which the states "are not required to convince the courts of the correctness of their legislative judgments." *Id*. at 464.

In *Weinberger*, in contrast, the Court rejected the government's proffered interest in "compensat[ing] women beneficiaries as a group for the economic difficulties which still confront women who seek to support themselves and their families" because "it [wa]s apparent both from the statutory scheme itself and from the legislative history" that that was not the legislation's purpose. 420 U.S. at 648. Because the legislation's true purpose was "in no way [] premised upon any special disadvantages of women," the gender-based distinction underlying the law was "entirely irrational." *Id*. at 648, 651.[17] *Weinberger*, in turn, relied on three earlier cases to hold that courts "need not in equal protection cases accept at face value assertions of legislative purposes, *when an examination of the legislative scheme and its history demonstrates that the asserted purpose could not have been a goal of the legislation*." 420 U.S. at 648 n.16 (emphasis added) (citing *Jimenez v. Weinberger*, 417 U.S. 628, 634 (1974); *Moreno*, 413 U.S. at 536; *Eisenstadt v. Baird*, 405 U.S. 438, 449 (1972)). The court assesses each of those precedents in turn.

In *Jimenez*, the Court struck down the Social Security Act's classification for disability insurance benefit purposes of different classes of children born out of wedlock. *See* 417 U.S. at 635–36 (recognizing first subclass of children "(a) who can inherit under state intestacy laws, or (b) who are legitimated under state law, or (c) who are illegitimate only because of some formal defect in their parents' ceremonial marriage" and second subclass of children denied benefits because they do not fall into any of those categories). The Court evaluated the statute's legislative history to determine that the primary purpose behind the statute was "to provide support for

---

[17] The Court did not state what standard it applied to the legislation at issue, although Justice Brennan, writing for the Court, recognized Court precedent striking down "gender-based differentiation premised upon assumptions as to dependency." *Id*. at 645.

dependents of a disabled wage earner," which contradicted the government's position during litigation that the statute was meant "to replace only that support enjoyed prior to the onset of [the parent's] disability." *Id*. at 634 (footnote omitted). The government argued that that qualification was necessary to prevent "spurious claims," which the Court recognized was a legitimate state interest, but the Court held that qualification could not stand without defeating what legislative history reflected was the true purpose of the statute. *See id*. at 636 ("[I]t would not serve the purposes of the Act to conclusively deny them an opportunity to establish . . . their right to insurance benefits, and it would discriminate between the two subclasses . . . without any basis for the distinction since the potential for spurious claims is exactly the same as to both subclasses.").

In *Moreno*, the Court relied on the "declaration of policy" in the Food Stamp Act to identify the purpose of the statute as "increased utilization of food in establishing and maintaining adequate national levels of nutrition [to] promote the distribution in a beneficial manner of our agricultural abundances and [to] strengthen our agricultural economy, as well as [to] more orderly market[] and distribut[e ]food." 413 U.S. at 533 (quoting 7 U.S.C. § 2011). The Court held that the challenged classification, which distinguished between households based on whether all residents were related to one another, was "clearly irrelevant" to that stated purpose, because "the relationships among persons constituting one economic unit and sharing cooking facilities have nothing to do with their abilities to stimulate the agricultural economy by purchasing farm surpluses, or with their personal nutritional requirements." *Id*. at 534 (and alteration omitted) (quoting district court decision at 345 F. Supp. 310, 313 (D.D.C. 1972). The court, as in *Jimenez*, also reviewed the legislative history, which revealed the legislature's true purpose of "prevent[ing] so[]called 'hippies' and 'hippie communes' from participating in the food stamp program," which amounted to an illegitimate purpose "to harm a politically unpopular group." *Id*. (citing H.R. Conf.

Rep. No. 91—1793, p.8; 116 Cong. Rec. 44439 (1970) (Sen. Holland)). During litigation, the government proffered a third purpose of the challenged amendment—to minimize fraud in the food stamp program—but the Court rejected that purpose as inconceivable, because the Food Stamp Act already had provisions meant to address fraud and people could have simply created separate households to avoid the restriction. *Id*. at 535–37.

Lastly, in *Eisenstadt*, the Court reviewed the stated purposes and legislative history of a Massachusetts law that limited access to contraceptives to married couples. In evaluating the text of the statute, the court held it was "so riddled with exceptions that [the purported purpose of] deterrence of premarital sex c[ould not] reasonably be regarded as its aim." 405 U.S. at 449. The Court also dismissed the purported purpose of public health because the statute was included in the legislative chapter dealing with "Crimes Against Chastity, Morality, Decency and Good Order" and specifically forbade doctors from prescribing contraceptives "even when needed for the protection of health." *Id*. at 450 (citation omitted).

The precedent described above establishes that a court may, where appropriate, reject the government's proffered interest as the motivation behind challenged legislation, but that is only the case where legislative history or the statute itself makes clear that the government is running afoul of the legislation's true purpose. In contrast, the plaintiffs here do not point to any circumstances that force the court to doubt the stated purpose of the RCOs. Conclusory allegations about "corrupt union bosses" and unspecified "work in the shadows" are hardly analogous to clear inconsistencies between statements about a statute's purpose contemporaneous to its passage and the government's position in subsequent litigation, like in *Jimenez*. Likewise, the stated purpose of ensuring qualified contractors is not "clearly irrelevant" to requiring contractors to utilize programs that offer meaningful training opportunities, as with the problematic amendment in

*Moreno.* Finally, the RCOs do not contain exceptions that would undercut, nor are they framed in a larger legislative context that casts doubt on, their stated purposes, as in *Eisenstadt.* To the contrary, there is nothing to suggest that the defendants have acted inconsistently here. Therefore, there is nothing "forcing" the court to conclude that ensuring a properly trained workforce could not have been the purpose behind the RCOs, and the decisionmakers' intent in passing the RCOs remains "entirely irrelevant for constitutional purposes." *Beach Commc'ns.*, 508 U.S. at 307. It follows that discovery into the "true" intent in passing the RCOs could not possibly change that analysis.[18] Therefore, because there is no reason to doubt the legitimacy of the RCOs' stated purpose, the court need not inquire any further into the theoretical alternative motivations that could have inspired their passage.

### 3. Rational Relationship to the Apprenticeship Requirement

a.      The Defendants have not Shown that they are Entitled to Discovery into the Rationality of the Relationship Between the RCOs' Proffered Purposes and the Apprenticeship-Program-Participation Requirement

Having determined that that RCOs are supported by a legitimate purpose, "[t]he only remaining question is whether [the government] achieved its purpose in a patently arbitrary or irrational way." *U.S. R.R. Ret. Bd.*, 449 U.S. at 460. The key question at this stage of litigation is whether the plaintiffs are entitled to discovery, which they believe will prove that the apprenticeship-program-participation requirement is irrational. *See* Opp. to Mot. to Dismiss at 10 ("As Plaintiffs allege in their Amended Complaints and as they will prove through discovery, the 'Class A' requirement of the RCO is not rationally related to its purported objective."). The plaintiffs suggest that a plaintiff is always is entitled to discovery under rational basis review to

---

[18] The plaintiffs seemed to concede at oral argument that the legislators' actual intent was not relevant under rational basis review but suggested that they should still be permitted discovery into the issue for purposes of their Pennsylvania public bidding law claim.

rebut the rationality of the government's action. The defendants, in contrast, suggest that a plaintiff is never entitled to discovery when the parties agree that rational basis is the proper standard. Both parties take their positions too far – whether discovery is necessary in the rational basis context is particular to the allegations at issue. In this case, the plaintiffs have not shown that discovery is warranted.

Courts, including the Third Circuit, have recognized the tension between an "ordinance's presumption of rationality [and] the liberal pleading standard of Fed.R.Civ.P. 12(b)(6)." *Rucci v. Cranberry Twp.*, 130 Fed. Appx. 572, 575 (3d Cir. 2005). But rather than resolving that tension by always allowing a plaintiff to engage in discovery (which obviously is not the standard approach, even in cases outside of the rational basis context), courts "accept as true all of the complaint's allegations, including all reasonable inferences that follow, and assess whether they are sufficient to overcome the presumption of rationality that applies to the ordinance." *Id.* (citing *Wroblewski v. City of Washburn*, 965 F.2d 452, 459 (7th Cir. 1992); *Zavatsky v. Anderson*, 130 F. Supp. 2d 349, 356 (D. Conn. 2001)). In making that assessment, the court is not "required to accept as true unsupported conclusions and unwarranted inferences." *Id.* (quoting *Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997)). In *Rucci*, the Third Circuit affirmed the district court's grant of the motion to dismiss, because even accepting all the allegations as true, the plaintiff had not pled sufficient facts to meet his burden where the challenged ordinance was a "logical way" to satisfy the township's legitimate interest in improving traffic safety and circulation. *Id.*

At oral argument, the plaintiffs took the position that the existence of a rational relationship between the challenged action and the state interest is a question of fact that must be resolved after discovery. The Third Circuit's decision in *Rucci* makes clear that that is not the case. To the

contrary, as the Third Circuit has explicitly recognized, "[d]etermining whether a particular legislative scheme is rationally related to a legitimate governmental interest is a question of law." *Sammon*, 66 F.3d at 645 (affirming dismissal at 12(b)(6) stage) (quoting *Rogin v. Bensalem Twp.*, 616 F.2d 680, 689 (3d Cir. 1980), *cert. denied*, 450 U.S. 1029 (1981)). In their supplemental briefing, the plaintiffs attempt to distinguish *Sammon* based on the underlying facts, *see* Suppl. Opp. to Mot. to Dismiss at 2–4, but factual distinctions are irrelevant to a clear rule of law.[19] *See Gaalla v. Citizens Med. Ctr.*, 407 F. App'x 810, 814 (5th Cir. 2011) (per curiam) ("Whether a governmental action passes rational basis muster is a question of law that this court reviews *de novo*." (citation omitted)); *Synagro-WWT, Inc. v. Rush Twp.*, 204 F. Supp. 2d 827, 832 (M.D. Pa. 2002) ("Synagro challenges the validity of a municipal ordinance. Virtually each of Synagro's allegations—i.e. preemption, equal protection, substantive due process, etc.—involve almost exclusively questions of law and present little or no need for factfinding."). The plaintiffs have not—and cannot—explain how their position that "plaintiffs must be given an opportunity, through discovery, to develop a factual record to demonstrate that the RCOs are not rational as a matter of law," Suppl. Opp. to Mot. to Dismiss at 4, is reconcilable with *Sammon* and the many other cases affirming dismissal at the 12(b)(6) stage. *See, e.g.*, *Connelly*, 706 F.3d at 216 (affirming district court's dismissal of equal protection claim because assumptions underlying challenged policy were reasonable); *Angstadt v. Midd-West Sch. Dist.*, 377 F.3d 338, 344–45 (3d Cir. 2004) (accepting that defendant's proffered reasons provided rational basis, despite plaintiffs' allegations that challenged requirements were unreasonable, arbitrary and capricious); *Ramsgate Court*

---

[19] The plaintiffs also seek to distinguish *Sammon* claiming that case addressed due process allegations. *See* Suppl. Opp. to Mot. to Dismiss at 3. That argument is unavailing as the substance of the rational basis standard does not differ between equal protection and due process, even if the focus is somewhat different. *See Doe v. City of Butler*, 892 F.2d 315, 319 n.2 (3d Cir. 1989) ("Although the inquiry may be different, the concept of rationality, which is the central issue before us, remains the same and we therefore may look to equal protection cases for guidance [in this due process challenge]"); *see also infra* p. 52

*Townhome Ass'n v. West Chester Borough*, 313 F.3d 157, 160 (3d Cir. 2002) (affirming district court's dismissal of equal protection claim "[b]ecause of the presumption of constitutionality and the legitimate economic rationale for the ordinance . . . .").

For similar reasons, the plaintiffs' argument that rational basis is a rebuttable presumption that mandates discovery is unavailing. *See* Opp. to Mot. to Dismiss at 12. Interestingly enough, all parties rely heavily on the Supreme Court's decisions in *Heller v. Doe by Doe*, 509 U.S. 312 (1993) and *Armour v. City of Indianapolis*, 566 U.S. 673 (2012) to support their respective positions on whether discovery is necessary here. For example, Plymouth cites to *Armour's* holding that "rational basis review requires deference to reasonable underlying legislative judgments," Mem. of Law in Supp. of Def.'s Mot. to Dismiss Pls.' Am. Compl. Pursuant to Fed. R. Civ. P. 12(b)(6) and to Strike Scandalous Allegations Pursuant to Fed. R. Civ. P. 12(f) ("Plymouth Mem.") at 10, Civ. A. No. 18-3908, Doc. No. 32 (quoting 566 U.S. at 680), and to *Heller's* holding that "rational-basis review in equal protection analysis is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Id.* at 12 (emphasis omitted) (quoting 509 U.S. at 319).

The plaintiffs, meanwhile, place great emphasis on the fact that *Heller* and *Armour* were decided at summary judgment, not the motion to dismiss stage. *See* Opp. to Mot. to Dismiss at 11. However, as the plaintiffs recognize, neither *Heller* nor *Armour* addressed the question here—whether dismissal without discovery would have been appropriate—because the trial court in both cases improperly ruled in favor of the plaintiffs.[20] *See* Opp. to Mot. to Dismiss at 11 ("Thus, the question of a party's ability to conduct discovery into the purported rationality of the challenged

---

[20] In *Armour*, the state trial court granted summary judgment in favor of the plaintiffs and the Indiana Court of Appeals affirmed. The Indiana Supreme Court then reversed, holding that the city's actions were rationally based, and the United States Supreme Court affirmed the decision. *See* 566 U.S. at 679–80. In *Heller*, the district court entered summary judgment in favor of the plaintiffs, which the Sixth Circuit affirmed. The Supreme Court then reversed. *See* 509 U.S. at 318.

legislation was never before the Court in either *Heller* or *Armour*."). This was especially true in *Armour*, as the parties agreed that no material facts were in dispute, so discovery would have been unnecessary in any event. *See City of Indianapolis v. Armour*, 918 N.E. 2d 401, 409 (Ind. Ct. App. 2009), *vacated by* 946 N.E.2d 553 (Ind. 2011), *aff'd*, 566 U.S. 673 (2012). And contrary to the plaintiffs' assertions here, nowhere in *Heller* or *Armour* did the Court suggest a plaintiff is always entitled to discovery when the classification is subjected to rational basis review. If anything, the Court's language in both cases suggests just the opposite. *See Armour*, 566 U.S. at 684 (indicating that plaintiffs' factual arguments about government action's potential consequences need not be considered "for the administrative considerations we have mentioned are sufficient to show a rational basis for the City's distinction"); *Heller*, 509 U.S. at 320 ("A State, moreover, has no obligation to produce evidence to sustain the rationality of a statutory classification. A legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data.") (alteration and internal quotation marks omitted) (quoting *Beach Commc'ns.*, 508 U.S. at 315)).

In support of their request that the court allow this case to proceed to discovery, the plaintiffs point to *Heller's* statement that "the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it." Opp. to Mot. to Dismiss at 11 (emphasis omitted) (quoting 509 U.S. at 320). But the plaintiffs excerpt that language in a way that fundamentally changes its meaning. The court quotes it here in full:

> A State, moreover, has *no obligation to produce evidence to sustain the rationality of a statutory classification*. A legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data. A statute is presumed constitutional, and the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it, *whether or not the basis has a foundation in the record.*

509 U.S. at 320–21 (internal quotation marks, citations, and alterations omitted) (emphasis added). Similarly, the Court stated in *Armour*, "In any event, a legislature need not actually articulate at any time the purpose or rationale supporting its classification. Rather, the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it." *Armour*, 566 U.S. at 685 (internal quotation marks and citations omitted). Requiring the defendants to undergo discovery—even though the RCOs are facially neutral and the plaintiffs have pointed to nothing in the legislative histories or the texts themselves that disputes the purported purposes— would obligate them to "produce evidence to sustain the rationality of" the RCOs. Such a result would clearly run afoul of the relevant jurisprudence.

*Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356 (1973) which *Heller* cites for the "burden" quote,[21] further demonstrates that the plaintiffs' reading is incorrect. In that case, the Court held, "[w]e cannot say that investigation in these fields *would not* disclose a basis for the legislation which would lead reasonable men to conclude that there is just ground for the difference here made." 410 U.S. at 360 (emphasis added) (quoting *Lawrence v. State Tax Comm'n of Miss.*, 286 U.S. 276, 283–84 (1932)). Thus, the relevant question was not whether the defendant had provided "just ground" for the challenged tax, but instead whether investigation could not possibly have revealed any such ground. The Court then laid out the purported purpose the state had provided for the law and concluded that it "could strike down [the law] as discriminatory only if [it] substituted [its] judgment on facts of which [it] c[ould] only be dimly aware for a legislative judgment that reflects a vivid reaction to pressing fiscal problems." *Id*. at 365.

---

[21] *Armour*, in turn, cites *Heller* for the quote. *See* 566 U.S. at 685.

The Court made this framework even more clear in *Vance v. Bradley*, 440 U.S. 93 (1979), in which it rejected an equal protection challenge to a lower mandatory retirement age in the Foreign Service than in the Civil Service. The Court explained:

> Appellees rely in particular on the posture of the case—cross motions for summary judgment. They point out that their affidavits state that many overseas posts are as comfortable and safe as any in the United States; that many Foreign Service personnel under 60 have health problems; that employees just under the mandatory retirement age fill their fair share of hardship posts; and that age is not related to susceptibility to certain diseases and ailments commonly linked to life overseas.

> Appellees seem to believe that appellants had to have current empirical proof that health and energy tend to decline somewhat by age 60 and had to offer such proof for the District Court's perusal before the statute could be sustained. Such evidence of course would argue powerfully for sustaining the statute. But this case, as equal protection cases recurringly do, involves a legislative classification contained in a statute. In ordinary civil litigation, the question frequently is which party has shown that a disputed historical fact is more likely than not to be true. In an equal protection case of this type, however, those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker.

440 U.S. 93, 110–11 (citations and internal footnote omitted). Thus, allowing the plaintiffs to engage in discovery so that they can offer competing facts to those on which the defendants relied would be a fruitless exercise, because no amount of discovery can refute that the defendants could have reasonably conceived it to be true that limiting the biding process to contractors who participate in certain apprenticeship programs could increase the likelihood of employing well trained craftspeople on public jobs. *See id*. at 112 (noting that legislative fact on which Congress relied was "common-sense proposition").

The other cases the plaintiffs cite likewise do not support the conclusion that a plaintiff is *always* entitled to discovery under rational basis review, but instead only that discovery is appropriate where the classification appears arbitrary on its face. In *Borden's Farm Products Co. v. Baldwin*, the Supreme Court evaluated a New York law that authorized the Milk Control Board

to fix minimum prices for bottled milk and to offer more favorable prices to milk dealers who did not have a "well advertised trade name." 293 U.S. 194, 200 (1934). The Court recognized its own long history of holding "a mere general allegation of repugnance to the Fourteenth Amendment [] not enough to state a cause of action to restrain the enforcement of a statute or administrative order." *Id.* at 203 (citations omitted). However, the Court also noted the importance, when examining the sufficiency of a plaintiff's allegations, of "tak[ing] note of the nature and effect of the legislative action which is assailed." *Id.*

In the context of New York's law, the Court held:

> Both nature and effect are apparent. We have here a novel, if not a unique, provision. The legislature does not purport to exercise an authority merely to fix prices, or minimum prices, or to make different prices for different grades of milk, but attempts to establish for the respective dealers different minimum prices for the same grade of milk, bought and sold at the same time and place and under precisely the same conditions aside from the use of a well advertised trade name. There is no uncertainty as to the effect of the discrimination.

*Id.* at 203–04. The Court then observed that there was no apparent connection between New York's purported purpose and the law itself. *See id.* at 205 ("The ground chiefly urged is that the provision is intended as a precaution against monopoly[, but] the expressed criterion of the statute . . . does not refer to restraint of trade in any of its connotations, or to any coercive action or unfair practice, or to any combination or concert.").

Similarly, in *Kuromiya v. United States*, the court addressed a classification that was "apparent" from the face of the federal government's program of allowing only a small group of individuals to use marijuana for medical purposes. *See* 37 F. Supp. 2d 717, 729 (E.D. Pa. 1999) ("Here, the classification being challenged is apparent: plaintiffs argue that it is a violation of equal protection for the government to make an exception to its criminal laws for one group of

individuals but not for another group of individuals that is similarly situated.").[22] The government had proffered as a rational basis for its decision to exclude the plaintiffs from its "compassionate use" marijuana program that prescribing marijuana to treat illness was "bad public policy and bad medical practice." *Id*. at 729 (citation omitted). But that purported basis did not explain why, by government counsel's own admission, "the government itself provide[d] marijuana to another group of persons suffering illnesses, through their physicians." *Id*. at 720. Thus, in many ways, *Kuromiya* was similar to a selective enforcement case, and the court denied the motion to dismiss the equal protection claims because it was "premature to dismiss the plaintiffs' equal protection claims regarding access to the compassionate use program by which marijuana is *distributed to select individuals*." *Id*. at 721 (emphasis added).

In both *Borden's Farm Products Co.* and *Kuromiya*, the plaintiffs' claims moved forward because the defendants' proffered purpose seemed inconsistent, on its face, with the challenged action. The plaintiffs' citation to *Checker Cab Philadelphia v. Philadelphia Parking Auth.*, Civ. A. No. 16-4669, 2017 WL 2461980 (E.D. Pa. June 6, 2017) is even more misplaced. *See* Opp. to Mot. to Dismiss at 14. In that case, the court denied the defendant's motion to dismiss because "no rational basis ha[d] been advanced for the [defendant's] failure to regulate the [similarly situated class]." 2017 WL 2461980, at *5. Instead, the defendant had argued that it had no authority to regulate the purportedly similar class, which was contradicted by evidence that the defendant had previously "take[n] some measures" against the comparable companies. *See id*. at *6.

The plaintiffs' reliance on cases involving minority groups is equally unavailing. They cite to *Massachusetts v. United States Department of Health and Human Services*, which addressed

---

[22] The plaintiffs argue that the *Kuromiya* decision "directly controls the outcome of" the motions here. Opp. to Mot. to Dismiss at 14. Aside from the fact that *Kuromiya* is distinguishable, the decision of a peer district court is not "controlling" on this court, especially where Supreme Court and Third Circuit decisions directly contradict the plaintiffs' positions.

the Defense of Marriage Act's ("DOMA") distinction between homosexual and heterosexual marriages, for the proposition that "a court must be presented with a factual record to enable an evaluation of the 'case-specific nature of the discrepant treatment, the burden imposed, and the infirmities of the justifications offered.'" Opp. to Mot. to Dismiss at 14 (quoting 682 F.3d 1, 10 (1st Cir. 2012)). However, they ignore that the court made that statement in the context of discussing "Supreme Court equal protection decisions [in the rational basis context that] have both intensified scrutiny of purported justifications where minorities are subject to discrepant treatment and have limited the permissible justifications." *Massachusetts*, 682 F.3d at 10 (discussing precedent involving *Moreno*, 413 U.S. at 528 (hippies and hippy-communes, *see supra* at pp. 29–30); *City of Cleburne*, 473 U.S. at 432 (the mentally disabled); and *Romer v. Evans*, 517 U.S. 620, 632 (1996) (homosexuals)). Similarly, in *Pedersen v. Office of Personnel Management*, the District of Connecticut held that DOMA's sexuality classification had no rational basis. *See* 881 F. Supp. 2d 294, 314 (D. Conn. 2012) ("Thus the Court's analysis will be cognizant of social, cultural and political perspectives grounded in experience as opposed to abstract logic and an awareness that there is likely no single talisman that signals which groups are the subject of classifications offensive to the principle of equal protection."). The ordinances at issue here distinguish between contractors who use apprenticeship programs that meet certain standards and those that do not. Needless to say, those groups do not constitute politically unpopular minorities. And even accepting as true the plaintiffs' conclusory allegation that the RCOs are meant to distinguish between unions and non-unions, that distinction is not the sort that warrants "intensified scrutiny" either.

The three other cases upon which the plaintiffs rely are so-called "class of one" cases. *See* Opp. to Mot. to Dismiss at 14–15 (citing *Montanye v. Wissahickon Sch. Dist.*, 327 F. Supp. 2d

510, 516 (E.D. Pa. 2004); *Old York LLC v. Twp. of Abington*, Civ. A. No. 16-1731, 2017 WL 634048, at *5 (E.D. Pa. Feb. 16, 2017); *Strain v. Borough of Sharpsburg*, Civ. A. No. 04-1581, 2006 WL 2087497, at *5 (W.D. Pa. June 28, 2006)). In a class of one case, plaintiffs may prevail upon a showing that (1) the government intentionally treated them differently from others similarly situated and (2) there was no rational basis for the different treatment. *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam). Even if the underlying legislation is rational, a class of one plaintiff may make out a claim if the defendant has no rational basis to enforce the law selectively. *See Cradle of Liberty Council, Inc. v. City of Philadelphia*, Civ. A. No. 08-2429, 2008 WL 4399025, at *7 (E.D. Pa. Sept. 25, 2008) ("There is no rational basis for this differential treatment evident in the Complaint or in some other admissible form, and the City does not argue otherwise." (footnote omitted)).

In *Montanye*, the court held that the plaintiff had "ple[d] sufficient facts to support th[e] contention" that the defendant's treatment of her lacked a rational basis, where she alleged specific facts to show the defendant sought to "'[p]unish[] and intimidate' special education teachers in order to reduce the special education services [at the school, which wa]s not a legitimate government purpose." 327 F. Supp. 2d at 521. Similarly, in *Old York LLC* the plaintiff pled specific facts about the "numerous zoning, construction, and occupancy requirements" the defendant required its building project, but not a comparable property, to meet. *See* 2017 WL 634048 at *5 (citing complaint). The court referred to a declaration the defendant submitted to refute the plaintiff's allegations but did not reference the defendant providing a rational basis that justified the different treatment. *See id.*[23] Lastly, in *Strain*, the court held that a class of one theory is most

---

[23] The court also stated that "whether the Township had a rational basis for its alleged different treatment is an issue of fact that cannot be resolved at the motion to dismiss stage." *Id.* at *5 (citing *Rittenhouse Entm't, Inc. v. City of Wilkes-Barre*, 861 F. Supp. 2d 470, 481 (M.D. Pa. 2012). Even if limited to the class of one context, that language is inconsistent with Third Circuit precedent. *See, e.g.*, *Newark Cab Ass'n v. City of Newark*, 901 F.3d 146, 156–57 (3d

applicable "where a public official, with no conceivable basis for his action, penalizes a hapless private citizen" and that "Strain's allegations, considered in isolation, place him very close to the paradigm." 2006 WL 2087497 at *5 (quotation mark omitted) (quoting *Lauth v. McCollum*, 424 F.3d 631, 633 (7th Cir. 2005)), *R&R adopted by* No. Civ. A. 04-1581, 2006 WL 2089957 (W.D. Pa. July 25, 2006).[24] Here, Associated Builders is a trade association with 22,000 chapter members nationwide, with 500 member companies and approximately 14,000 employees in Eastern Pennsylvania alone. There is nothing to suggest that Associated Builders—or the other plaintiffs for that matter—could appropriately be described as "hapless," nor are there any allegations that a public official sought to baselessly penalize the plaintiffs. More importantly, the plaintiffs have pled no facts that undermine the conceivability of the defendants' rational bases for the RCOs.

b.      The Plaintiffs' Allegations of Mere Disparate Impact Fail Under Rational Basis Review

Unlike under higher standards of judicial scrutiny, a piece of legislation may withstand rational basis review even if it disproportionately burdens or is unfair to a particular class. *See U.S. R.R. Ret. Bd.*, 449 U.S. at 178 ("The task of classifying persons for ... benefits ... inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line . . . ." (first two omissions in original) (quoting *Mathews v. Diaz*, 426 U.S. 67, 83–84 (1976)); *Schumacher v. Nix*, 965 F.2d 1262, 1273 (3d Cir. 1992) ("And at least under rational basis review, it is clear that states may draw classifications with substantially less than mathematical exactitude, even though, in practice, such classifications result in some

---

Cir. 2018) (affirming grant of motion to dismiss in class of one case because allegations that challenged regulations were arbitrary and irrational failed in light of rationality of government action); *Aulisio v. Chiampi*, No. 17-3301, 2019 WL 1299712, at *3 (3d Cir. Mar. 20, 2019) (affirming grant of motion to dismiss because "[e]ven if [the] complaint sufficiently shows that he was treated differently from similarly situated persons and that the treatment was intentional, [the plaintiff] has failed to show that defendants lacked any rational basis for the difference in treatment").

[24] The actions alleged in *Strain* included that the defendants, for personal and political reasons, terminated the plaintiff's employment and caused criminal charges to be filed against him, knowing they were baseless. *See* Second Am. Compl. at ¶¶ 11–13, Civ. A. No. 04-1581 (W.D. Pa.), Doc. No. 49.

inequality." (internal quotation marks and citations omitted)). Indeed, courts will uphold the government's action "even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous." *Romer*, 517 U.S. at 632 (citations omitted). Rational basis does not require perfection, and "[i]f the classification has some reasonable basis, it does not offend the Constitution simply because the classification is not made with mathematical nicety or because in practice it results in some inequality." *Dandridge v. Williams*, 397 U.S. 471, 485 (1970) (citation and internal quotation marks omitted); *see also Metropolis Theater Co. v. City of Chi.*, 228 U.S. 61, 69–70 (1913) ("To be able to find fault with a law is not to demonstrate its invalidity. It may seem unjust and oppressive, yet be free from judicial interference. The problems of government are practical ones and may justify, if they do not require, rough accommodations,[]illogical, it may be, and unscientific."). The broad deference that rational basis review provides to the government "recogni[zes] that the process of democratic political decisionmaking often entails the accommodation of competing interests, and thus necessarily produces laws that burden some groups and not others." *Rogin*, 616 F.2d at 687 (affirming dismissal on pleadings of equal protection and substantive due process claims).

The plaintiffs essentially argue that the RCOs have a disparate impact on non-unions: "the vast majority, if not[] all contractors that will be excluded from bidding because of the 'Class A' requirement are non-union or merit-shop contractors . . . ." Opp. to Mot. to Dismiss at 30. But as a matter of law, their claims cannot succeed just because the RCOs may be unfair. *See* Basu Aff. at 1 (the RCOs "treat[] similarly situated people dissimilarly, and [are] therefore anathema to fairness."); *Beach Commc'ns*, 508 U.S. at 311 ("[E]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices."). To the contrary, the fact that the RCOs may primarily, or even exclusively, burden the plaintiffs and other non-unions does not

amount to an equal protection violation. As all courts must recognize, politics—and economic legislation in particular—involves complicated problems that warrant complicated solutions. Some inequality will be inevitable in that sort of problem solving, and a holding that inequality or unfairness, in and of itself, creates a constitutional violation would virtually shut down the legislative process.

c.    Rational Basis Review does not Allow the Court to Substitute its own Judgment for the Legislature's

Rational basis review leaves the court no discretion to substitute its own judgment for a policy that is not arbitrary, even if the state's action seems unwise. *See Vance*, 440 U.S. at 97 ("[J]udicial intervention is generally unwarranted no matter how unwisely [the court] may think a political branch has acted. Thus, [the court] will not overturn such a statute unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational."). A court will not "sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines; in the local economic sphere, it is only the invidious discrimination, the wholly arbitrary act, which cannot stand consistently with the Fourteenth Amendm[en]t." *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) (per curiam) (citations omitted). Plaintiffs cannot prevail under rational basis review by suggesting that they could craft a superior piece of legislation, for "the Constitution does not require the [government] to draw the perfect line nor even to draw a line superior to some other line it might have drawn. It requires only that the line actually drawn be a rational line." *Armour*, 566 U.S. at 685. Even if there is reason to believe the government's judgment in passing the legislation was incorrect, the plaintiffs' claims still fail, so long as it was not wholly arbitrary. *See Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 613 (2008) (Stevens, J., dissenting) ("Moreover,

the Equal Protection Clause proscribes arbitrary decisions—decisions unsupported by any rational basis—not unwise ones. Accordingly, a discretionary decision with any 'reasonably conceivable' rational justification will not support an equal protection claim; only a truly arbitrary one will.").

The question for the court to answer here is whether the RCOs' apprenticeship-program-participation requirement is "arbitrary and unreasonable" in light of the defendants' legitimate interest, "not merely possibly, but clearly and actually so." *Bachtel v. Wilson*, 204 U.S. 36, 41 (1907) (citing *Carroll v. Greenwich Ins. Co.*, 1999 U.S. 401, 411 (1905)). The plaintiffs offer many arguments for why an alternative requirement would have been a superior method for the defendants to ensure only trained craftspeople work on public projects. First, the plaintiffs argue that the "'Class A' requirement does absolutely nothing to ensure that the *individuals* who actually perform work on the projects are actually enrolled in and/or have graduated from a 'Class A' program." Opp. to Mot. to Dismiss at 7. But the defendants need not demonstrate that the RCOs guarantee that every craftsperson on every public project is trained to the highest standards to demonstrate that the participation requirement is rationally related to their interest. Instead, the defendants prevail if it was conceivable for the decisionmakers to believe that participation in a certified apprenticeship program could, overall, increase the likelihood of contractors on public projects employing adequately trained craftspeople. The fact that there are theoretical ways a contractor could avoid training its employees while still qualifying under the RCOs does not change that result, and the defendants are certainly under no obligation to produce evidence to prove to the court or the plaintiffs that there is no possible way the RCOs' requirements could ever be manipulated.[25]

---

[25] That said, the court seriously doubts the feasibility of the plaintiffs' hypothetical that a contractor could sign a union agreement and thereby "magically convert [itself] from an unqualified contractor into a 'responsible' contractor under the RCO overnight, despite that none of the contractor['s ]employees actually participate in or have graduated from a 'Class A' apprenticeship program." Opp. to Mot. to Dismiss at 8. First, as the plaintiffs acknowledge in a footnote,

Conversely, the plaintiffs also argue that the RCOs are irrational because participation in an apprenticeship program is unnecessary to build an adequately trained workforce. *See, e.g.*, Northampton Compl. at ¶¶ 6–7 (asserting that plaintiffs' craftspeople are fully qualified despite not graduating from apprenticeship program). But the government is free to impose requirements that ensure most of the relevant individuals will receive adequate training, even if those requirements are burdensome on those who could have been qualified without that level of training. *See Sammon*, 66 F.3d at 646 ("The New Jersey legislature may well have decided that the 1800-hour training requirement will assure that midwives who go through 1800 hours' instruction are competent *often enough* to justify the burden to students who are competent at some point before 1800 hours of study."). "While different training requirements might also further [the government's] valid goals, it is for the legislature, not the courts, to balance the advantages and disadvantages of the . . . requirement." *Id.* (quoting *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 487 (1955)).

Relatedly, the plaintiffs' purported expert concedes, "apprenticeships represent an important source of human capital formation. Perhaps this is why many organizations offer them."

---

two of the RCOs, Northampton's and Plymouth's, require bidders to have participated in the qualifying apprenticeship program for at least three years before becoming eligible. *See* Northampton RCO at ECF p. 4; Plymouth RCO at ECF p. 5. Second, it is not at all clear that a contractor could sign a collective bargaining agreement under the National Labor Relations Act, as the plaintiffs suggest, and suffer no consequences other than being deemed a qualified bidder under the RCOs. Third, all four RCOs require the contractor to "participate[]" in an apprenticeship program, not just be loosely associated with one. *See* Northampton RCO at ECF p. 4; Colonial RCO at ECF p. 4; Plymouth RCO at ECF p. 5; West Norriton RCO at ECF p. 31. This is especially true because mere certification that a bidder complies with the RCOs is insufficient to establish that a bidder is necessarily qualified. To the contrary, the "[e]xecution of the Contractor Responsibility Certification required by this ordinance shall not establish a presumption of contractor responsibility and [the municipality] may require any additional information it deems necessary to evaluate a firm's status as a responsible contractor, including technical qualifications, financial capacity or other resources and performance capabilities." Plymouth RCO at ECF p. 4; *see also* Northampton RCO at ECF p. 5 (requiring bidders to submit "documentation verifying it participates in a Class A Apprenticeship Program . . . ."); Colonial RCO at ECF p. 4 (explaining that Colonial "determine[s] whether the firm meets the requirements under the" RCO after bidder submits certification); West Norriton RCO at ECF p. 32 (stating township "may require any additional information it deems necessary to evaluate a Firm's status as a responsible contractor, including technical qualifications, financial capacity or other resources and performance capabilities.").

Basu Aff. at 2. Mr. Basu disputes that any particular apprenticeship program is superior to any other and suggests that using different types of training programs "is not only consistent with amassing large quantities of human capital, but . . . [also] induce[s the various programs] into competing against one another on an ongoing basis, potentially elevating the quality of instruction in the process." *Id*. But the very fact that the plaintiffs appended an expert affidavit challenging the wisdom of the RCOs "from a public policy perspective" proves that this is a matter for the political process, not the court, to resolve. *See Beach Commc'ns*, 508 U.S. at 320 ("The assumptions underlying these rationales may be erroneous, but the very fact that they are arguable is sufficient, on rational-basis review, to immunize the congressional choice from constitutional challenge." (citation, internal quotation marks, and alteration omitted); *Clover Leaf,* 449 U.S. at 469 ("Since in view of the evidence before the legislature, the question clearly is at least debatable, the Minnesota Supreme Court erred in substituting its judgment for that of the legislature." (internal quotation marks and citation omitted)); *Doe v. Pa. Bd. of Prob. & Parole,* 513 F.3d 95, 117 (3d Cir. 2008) ("If the question is at least debatable, the Commonwealth's classification survives rational basis review." (citation and internal quotation marks omitted)); *Sammon*, 66 F.3d at 646 ("While we do not question plaintiffs' sincerity when they voice this opinion [that the challenged training requirement was not rationally related to the state's purpose], it is sufficient to conclude that this is a matter about which reasonable minds can differ.").

The plaintiffs and Mr. Basu's arguments are precisely the sort of second-guessing of legislative judgments that rational basis review does not allow. Perhaps it would have been more effective for the defendants to require that each individual craftsperson graduated from a certified apprenticeship program. Perhaps it would have been wiser for the defendants to have allowed a variety of training mechanisms that could qualify a contractor to bid on public project. But it is not

this court's or the plaintiffs' role to substitute its judgment for the legislature's, regardless of whether or not that judgment is superior.[26] *See Vance*, 440 U.S. at 97 ("[J]udicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted."); *Harold v. Richards*, 334 F. Supp. 3d 635, 643 (E.D. Pa. 2018) (granting motion to dismiss because proffered interests were "unquestionably legitimate, even if the law [wa]s not the only or most desirable way to achieve these goals. The Court is limited to determining whether there is a rational basis for the legislation, not if it is wise or even necessarily effective"). The plaintiffs repeatedly assert that rational basis review does not require the court to "rubberstamp" the RCOs based "on the *ipse dixit* assurances of the government." Suppl. Opp. to Mot. to Dismiss at 2. But the court's conclusion that the RCOs withstand rational basis review does not rely on the defendants' assurances that the apprenticeship-program-participation requirement is rational. Rather, the court is relying on the inherent logic that is clear from the face of the RCOs themselves, which is perfectly appropriate at the motion to dismiss stage. *See, e.g.*, *Connelly*, 706 F.3d at 217 (affirming district court dismissal of equal protection claim because "[g]iven the deferential standard we employ when considering a state policy under rational basis review, the[ proffered] reasons suffice to uphold Steel Valley's policy." (internal citation omitted)); *Ramsgate Ct. Townhome Ass'n*, 313 F.3d at 160 (affirming district court's dismissal of equal protection claim "[b]ecause of the presumption of constitutionality and the legitimate economic rationale for the ordinance"); *Chapman v. Pa. Interscholastic Athletic Ass'n*, No. 1:14-192, 2014 WL 2770699, at *9 (M.D. Pa. June 18, 2014) ("Rational basis review is highly deferential, and Plaintiff has not met her heavy

---

[26] The court does not mean to suggest that those suggestions are, in fact, superior to the RCOs' requirements. To the contrary, the legislators could have conceivably concluded that requiring contractor participation, rather than individual participation, was a more easily verifiable and efficient method to identify qualified contractors. There is nothing to suggest such a conclusion would have been irrational. *See Armour*, 566 U.S. at 682 (recognizing administrative concerns as rational basis).

burden, even on a motion to dismiss, to overcome the presumption of rationality afforded to the Attendance Rule." (footnote and citation omitted)).

The plaintiffs seek an evidentiary hearing where the parties can put forth competing evidence about the likely effectiveness of the apprenticeship-program-participation requirement. But the law does not entitle them to one. *See DeSousa v. Reno*, 190 F.3d 175, 184 (3d Cir. 1999) ("Indeed, such a classification can be upheld as constitutional even when it was based on rational speculation rather than on empirical data." (citation omitted)); *Hancock Indus.*, 811 F.2d at 238 ("Accordingly, it is not enough for one challenging a statute on equal protection grounds to introduce evidence tending to support a conclusion contrary to that reached by the legislature.").[27] The plaintiffs ask whether it is arbitrary and irrational to believe that a contractor that has undertaken the time and expense of participating in a federal- or state-approved apprenticeship program is more likely to ensure its workers are properly trained than one that has not. Regardless of what evidence the plaintiffs could theoretically present, the only logical answer is no.

## C.    Substantive Due Process Claims

The Fourteenth Amendment establishes that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The parties again agree that rational basis is the applicable standard for the plaintiffs' substantive due process claim.[28] *See* Opp. to Mot. to Dismiss at 16; Mem. of Law in Supp. of Def.'s Mot. to Dismiss Pls.'

---

[27] For the same reason, Mr. Basu's assertion that "no evidence is put forth by those promulgating the Responsible Contractor Ordinance indicating that participation in a Class A Apprenticeship Program for a certain time period generates superior construction outcomes than other sources of training, at least for projects valued at the specified thresholds" is irrelevant. Basu Aff. at 1–2.

[28] Colonial argues that the plaintiffs' substantive due process claim fails because they did not identify a fundamental right or demonstrate that the RCOs "shock the conscience." Colonial Mem. at 9–10. However, that standard applies to challenges to non-legislative state action, not pieces of legislation like those at issue here. *See Nicholas v. Penn. State. Univ.*, 227 F.3d 133, 139 (3d Cir. 2000) (providing overview of standards for assessing substantive due process challenge to legislative versus non-legislative actions). At oral argument, all the parties limited their arguments to the rational basis standard.

First Am. Compl. Pursuant to Fed. R. Civ. P. 12(b)(6) and to Strike Scandalous Allegations Pursuant to Fed. R. Civ. P. 12(f) ("Northampton Mem.") at 23, Civ. A. No. 18-2552, Doc. No. 38; Plymouth Mem. at 24; West Norriton Twp. Mem. at 14–15. On rational basis review, "a statute withstands a substantive due process challenge if the state identifies a legitimate state interest that the legislature rationally could conclude was served by the statute." *Sammon*, 66 F.3d at 645. The challenged "law may exact a needless, wasteful requirement in many cases. But it is for the legislature, not the courts, to balance the advantages and disadvantages of the new requirement." *Williamson*, 348 U.S. at 487. That is because "the law need not be in every respect logically consistent with its aims to be constitutional. It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it." *Id*. at 487–88.

Like in the equal protection context, courts exercise caution to avoid improperly treading into the province of the legislature, and "invalidation of legislation for irrationality or arbitrariness[ ] is proper *only if the governmental body could have had no legitimate reason for its decision*." *Cty. Concrete Corp. v. Twp. of Roxbury*, 442 F.3d 159, 169 (3d Cir. 2006) (citation and internal quotation marks omitted). For that reason, defendants prevail so long as they can demonstrate "(1) the existence of a legitimate state interest that (2) could be rationally furthered by the statute." *Am. Express Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 366 (3d Cir. 2012) (citation omitted). Again, the plaintiffs "have the burden to negative every conceivable basis which might support" the legislation. *Id*. (citation and internal quotation marks omitted). In *Sidamon-Eristoff*, the Third Circuit did not consider the plaintiff's alleged improper basis for the legislation, because

> under rational basis scrutiny, a court's inquiry is limited to whether the law rationally furthers *any* legitimate state objective. It is enough that the State offers a conceivable rational basis for its action, and the court may even hypothesize the motivations of the state legislature to find a legitimate objective promoted by the

provision under attack. It is constitutionally irrelevant whether this reasoning in fact
underlay the legislative decision...."

*Id*. at 367 (internal quotation marks, citations, and alterations omitted). Due process differs from

equal protection rational basis analysis only in that "the focus of due process analysis is not

whether the [defendant] has irrationally distinguished between similarly situated classes, but

whether it was irrational for the [defendant] to have passed the law at all and to have applied it to

[the plaintiff]." *Rogin*, 616 F.2d at 689.

      As with the plaintiffs' equal protection arguments, the cases to which they cite in support

of their opposition to the motions to dismiss their substantive due process claims do not warrant

denying the motions. *See* Opp. to Mot. to Dismiss at 16–17 (citing cases). In *Frompovicz v.*

*Township of South Manheim*, the court applied an entirely different standard to the due process

claim than the one applicable here, and therefore never assessed whether the legislature could have

rationally concluded that the challenged law was rational. *See* No. 3:06cv2120, 2007 WL 2908292,

at *12 (M.D. Pa. Oct. 4, 2007) ("Since the actions about which plaintiff complains here are

individual decisions in zoning cases, not zoning ordinances themselves, we will apply the 'shocks

the conscience' standard to our evaluation."). The court allowed discovery to move forward not

because the plaintiff was entitled to explore any proffered rational basis for the challenged activity,

but to determine whether the alleged facts, which the court held could feasibly "shock the

conscience," were true. *See id*. at *13.

      In *Cornell Cos., Inc. v. Borough of New Morgan*, the court allowed the plaintiff to move

forward with its claims, which included alleged due process violations, where the plaintiff asserted

that the defendant had engaged in serious wrongdoing directed at the plaintiff, culminating in a

zoning ordinance amendment targeted at preventing the plaintiff from reopening its school.[29] 512

F. Supp. 2d 238, 249–53, 259–61 (E.D. Pa. 2007). The court held that in the context of a zoning

ordinance, "[a] legislative action is not taken for a legitimate reason if it is done to harm the interest

of a corporation and it is unrelated to land use planning." *Id.* at 260. Although the court recognized

that the complaint "hint[ed] at a possible legitimate reason for the passage" of the challenged

amendment, the plaintiff supported its claim that the only purpose of the statute was to punish it

with detailed factual allegations about the defendant's animus, including that the defendant was

"(1) making false statements to state agencies; (2) not abiding by the terms of [agreements with

the plaintiff]; and (3) engaging in [a] public campaign of misrepresenting the [school's] services

and facility." *Id.* In contrast, the RCOs do not just "hint" at a legitimate purpose: they explicitly

state that purpose on their faces. And the plaintiffs here have offered only conclusory allegations,

not facts, to suggest that all four defendants designed their ordinances with the end-goal of

penalizing non-unions in a way completely unrelated to the stated purposes. *Cf. Cty. Concrete

Corp.*, 442 F.3d at 170 ("Appellants have alleged facts that indicate irrationality and arbitrariness,

and present a case involving actions aimed at appellants for reasons unrelated to land use planning"

where plaintiffs alleged that defendants engaged in "verbal disparagement and the imposition of

illegal conditions and restrictions on their business in violation of a 1993 agreement." (internal

quotation marks and alteration omitted) (quoting *Pace Res., Inc. v. Shrewsbury Twp.*, 808 F.2d

1023, 1035 (3d Cir. 1987)).

      For the same reasons discussed in connection with the plaintiffs' equal protection claims,

the court cannot conclude that the RCOs' purported interest is not legitimate, let alone that there

---

[29] The plaintiff in *Cornell Cos., Inc.* "provide[d] correction, treatment, and rehabilitation services for juveniles who have been adjudicated delinquent." 512 F. Supp. at 249. Although not discussed in that decision, this court notes that juvenile delinquents are comparable to the "politically unpopular groups," to classifications of whom the Supreme Court has applied "intensified scrutiny," at least in the equal protection context. *See Massachusetts*, 682 F.3d at 10.

are no hypothetical conceivable interests that the RCOs support. Nor can the court conclude that the apprenticeship requirement was an irrational method of satisfying that interest. Thus, the plaintiffs' substantive due process claims likewise fail.

## D. ERISA Preemption

By its express terms, ERISA "superscede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of [the Act] and not exempt under section 1003(b) of [the Act]." 29 U.S.C. § 1144(a). Section 1003(a), in turn, applies to

> any employee benefit plan if it is established or maintained-- **(1)** by any employer engaged in commerce or in any industry or activity affecting commerce; or **(2)** by any employee organization or organizations representing employees engaged in commerce or in any industry or activity affecting commerce; or **(3)** by both.

29 U.S.C. § 1003(a). Section 1002(1) defines the terms "employee welfare benefit plan" and "welfare plan" to include "apprenticeship and other training programs." 29 U.S.C. § 1002(1).

A state law "relates to" an employee benefit plan for ERISA purposes where it "[1] has a connection with or [2] reference to such a plan." *Cal. Div. of Labor Standards Enf't v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 324 (1997) (hereinafter "*Dillingham*") (quotation marks and alteration omitted) (quoting *Dist. of Columbia v. Greater Wash. Bd. of Trade*, 506 U.S. 125, 129 (1992)). The law "refers to" an employee benefit plan if it "acts immediately and exclusively upon ERISA plans . . . or where the existence of ERISA plans is essential to the law's operation . . . ." *Id.* at 325 (internal citations omitted). An approved apprenticeship program does not "refer to" an ERISA plan where the "program[] need not necessarily [have been an] ERISA plan[]." *Id.*; *see also Ferguson Elec. Co., Inc. v. Foley*, 115 F.3d 237, 241 (3d Cir. 1997) (hereinafter "*Ferguson*") ("Apprenticeship laws make 'reference to' ERISA plans where 'approved apprenticeship programs need ... necessarily be ERISA plans.'" (quoting *Dillingham*, 519 U.S. at 325)). Also, a

law that is "indifferent to the funding, and attendant ERISA coverage, of apprenticeship programs . . . does not make reference to ERISA plans." *Dillingham*, 519 U.S. at 328. In *Ferguson*, the Third Circuit applied *Dillingham* to hold the Pennsylvania Prevailing Wage Act did not "make reference to" ERISA plans, because, like the California-approved apprenticeship programs at issue in *Dillingham*, a Pennsylvania "apprenticeship program may be approved regardless of its funding source and whether it is maintained by a single employer." 115 F.3d at 241 (citing 34 Pa. Code. §§ 83.2, 83.5).

If the court determines that the challenged law does not "refer to" an employee benefit plan, the court must then ask whether the law has any possible "connection with" such a plan. In answering that question, the court looks "both to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive, as well as to the nature of the effect of the state law on ERISA plans." *Dillingham*, 519 U.S. at 325 (internal quotation marks and citation omitted). "A law has a 'connection with' ERISA plans if it dictates the choices faced by ERISA plans. It is not enough if the law merely provides economic incentives to ERISA plans but does not 'bind them to anything.'" *Ferguson*, 115 F.3d at 240 (alteration omitted) (quoting *Dillingham*, 519 U.S. at 332). Although ERISA preemption has a "broad scope," in matters traditionally falling to the states, courts "have worked on the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Dillingham*, 519 U.S. at 324, 325 (quoting *Massachusetts*, 471 U.S. at 739; *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995) (hereinafter "*Travelers*")). To hold a state law preempted based on an overly "tenuous [] relation[ship]" between the challenged law and covered plans would do "grave violence to [the] presumption that Congress" does not intend to preempt state laws in traditionally

state-regulated areas. *Id*. at 334. Again, the Third Circuit held that Pennsylvania's apprenticeship requirement had no "connection with" ERISA plans under *Dillingham*, because "[t]he apprenticeship scheme in Pennsylvania does not bind ERISA plans to anything, but merely provides economic incentives to encourage apprenticeship programs to obtain state approval." *Ferguson*, 115 F.3d at 240.

In attempting to argue for preemption here, the plaintiffs somewhat oversimplify the ERISA preemption framework from *Dillingham* and *Ferguson*. *See* Opp. to Mot. to Dismiss at 33 ("Rather, the Court in *Dillingham* based its application of ERISA preemption on whether the statute 'nonetheless' had a 'connection with' such plans. . . . Rather, the question turns on whether the RCO 'relates to' an ERISA governed plan . . . ."). *Dillingham* makes clear that the "connection with" analysis is just one part of a court's "relates to" analysis, with the other part being the "reference to" inquiry. *See Dillingham* at 324. There is no question that the RCOs do not "reference" a covered plan, because, like the requirements upheld in *Ferguson*, they do not act "immediately and exclusively upon ERISA plans," nor is "the existence of ERISA plans [] essential to [their] operation." *Dillingham*, 519 U.S. at 325; *see also Ferguson*, 115 F.3d at 241 (holding that Pennsylvania apprenticeship requirements do not "reference" ERISA because "in Pennsylvania, an apprenticeship program may be approved regardless of its funding source and whether it is maintained by a single employer" (citing 34 Pa. Code. §§ 83.2, 83.5)).

The plaintiffs do not directly address the "reference" portion of the preemption framework, and they rely primarily on the First Circuit's decision in *Merit Construction Alliance v. City of Quincy*, 759 F.3d 122 (2014) (hereinafter "*Quincy*"), which focused on the "connection with" test. *See* Opp. to Mot. to Dismiss at 31–33; *Quincy*, 759 F.3d at 128 ("The battle here, as waged by the parties, focuses on the 'connection with' component of the two-sided ERISA preemption

calculus."). In *Quincy*, the First Circuit struck down an ordinance that required all bidders on public works to use an apprenticeship training program registered with the Massachusetts Department of Labor Standards, because the ordinance "mandate[d] an employee benefit structure and specifie[d] how that structure [was to] be administered," and thus had a "connection with" ERISA. 759 F.3d at 129. The First Circuit held that "[b]ecause the Ordinance unqualifiedly demand[ed] the maintenance of a specific type of apprentice training program as a condition of bidding, it exceed[ed] the boundaries of what ERISA allows." *Id.* at 130 (citing *Minn. Chapter of Associated Builders & Contractors, Inc. v. Minn. Dep't of Pub. Safety*, 267 F.3d 807, 818 (8th Cir. 2001)). More specifically, the fact that the ordinance required approval from the Massachusetts Department of Labor Standards meant that a qualifying apprenticeship training program must meet "a raft of stringent conditions . . . including, among others, documentation of the program's terms and conditions, the location of the program's apprentice activities, training and instruction, wage rates, recordkeeping, instructor qualifications, apprentice enrollment, reporting, and termination." *Id.* at 129 (internal citations to challenged law omitted).

As the First Circuit recognized, "[t]he path from influence to coercion amounts to a continuum and it is not always a simple task to determine where along this continuum a particular state law falls." *Id.* (citing *Travelers*, 514 U.S. at 668; Samuel C. Salganik, Note, *What the Unconstitutional Conditions Doctrine Can Teach Us About ERISA Preemption: Is it Possible To Consistently Identify "Coercive" Payor-Play Schemes?*, 109 COLUMBIA L. REV. 1482, 1515–19 (2009)). Although one cannot know precisely where on that continuum the First Circuit would have placed the RCOs at issue here, this court concludes that they fall on the side of influence. The court first notes that the ordinance at issue in *Quincy* was more burdensome on potential bidders than the one at issue here: "the Ordinance categorically require[d] all contractors on Quincy public

57

works projects to operate a Massachusetts-approved apprenticeship training program." *Id.* at 129

(citing ordinance). Here, in contrast, the RCOs allow for an apprenticeship program approved by

either the United States Department of Labor or *any* state apprenticeship agency. *See* Northampton

RCO at ECP p. 4; Colonial RCO at ECF p. 2; Plymouth RCO at ECF p. 5; West Norriton RCO at

ECF p. 32. Also, unlike the *Quincy* ordinance, the RCOs only apply to projects above a certain

monetary threshold and have no effect on a non-qualifying contractor's ability to bid on projects

falling below that threshold.[30]

The District of Delaware is the only court in this circuit to have directly addressed the

relevant sections of *Quincy*.[31] *See Associated Builders & Contractors, Inc. v. New Castle Cty.*, 144

F. Supp. 3d 633 (D. Del. 2015). The court reasoned that the Sixth Circuit's analysis in *Associated*

*Builders & Contractors v. Michigan Department of Labor & Economic Growth* followed more

closely the Supreme Court's framework by considering both whether "(1) the law at issue []

mandate[d] (or effectively mandate[d]) something; and (2) that mandate [fell] within the area that

Congress intended ERISA to control exclusively." 144 F. Supp. 3d at 637–38 (quoting *Associated*

*Builders & Contractors v. Mich. Dep't of Labor & Econ. Growth*, 543 F.3d 275 (6th Cir. 2008)).

In this regard, the court quoted the Sixth Circuit's reasoning:

> (1) because "no one disputes that the States have long regulated apprenticeship
> standards and training or that this topic of regulation falls well within their
> traditional police powers," there is a "presumption that [the state']s requirements

---

[30] The plaintiffs also cite to *Minnesota Chapter of Associated Builders & Contractors, Inc.* in support of their preemption argument. *See* Opp. to Mot. to Dismiss at 33. The requirements the 8th Circuit struck down in that case were more burdensome than the ordinance at issue in *Quincy* and certainly more burdensome than the RCOs at issue here, as it prohibited fire protection contractors from hiring *any* employee who was not a managing employee, certified journeyman, or registered apprentice, on *any* job, regardless of whether the work was a public or private job. *See Minn. Chapter of Associated Builders & Contractors, Inc.*, 267 F.3d at 814 ("[T]he Minnesota statutes and rules . . . require apprentice programs to comply with the Minnesota specifications. The Minnesota statute and rules do more than merely encourage or provide economic incentives to contractors to hire apprentices who are registered in approved programs, the Minnesota statute and rules absolutely demand it.").

[31] The District of New Jersey has also discussed *Quincy*, but in the context of the market participant exception. *See Associated Builders & Contractors, Inc. v. City of Jersey City*, No. 2:14-cv-5445-SDW-SCM, 2015 WL 4640600, at *6 n.4 (D.N.J. Aug. 3, 2015), *rev'd*, 836 F.3d 412 (3d Cir. 2016).

fall outside of ERISA's preemptive reach"; (2) "ERISA 'has nothing to say' about 'the standards to be applied to apprenticeship training programs,' and neither 'ERISA [nor] its legislative history [evinces] any intent on the part of Congress to preempt state apprenticeship training standards'"; (3) "what triggers ERISA's potential application to these laws is not the existence of an apprenticeship training program, ... but the existence of a separate fund to support the training program"; (4) ERISA does not regulate, e.g., the safety of apprentices or other substantive apprenticeship training standards but, rather, ERISA is "'expressly concerned'" with, e.g., "'reporting, disclosure, fiduciary responsibility, and the like'"; (5) "were it otherwise, ERISA might preempt all sorts of laws of general applicability that affect ERISA plans, a view that would preempt a slew of state laws"; and (6) other courts have found such apprenticeship requirements to be "'outside the area of ERISA's concerns'"

*Id.* at 638 (all but first alteration in original) (internal citations omitted).

To the extent the *Quincy* holding suggests that ERISA preempts the RCOs at issue here, this court agrees with the District Court for the District of Delaware that the Sixth Circuit's approach is more consistent with the Supreme Court's holding in *Dillingham* and the Third Circuit's holding in *Ferguson* than the *Quincy* decision. Under *Dillingham*, the key question is whether the challenged law "bind[s] ERISA plans to anything." 519 U.S. at 332. The law must "dicate[] the choices faced by ERISA plans," and "merely provid[ing] economic incentives to ERISA plans" is "not enough." *Ferguson*, 115 F.3d at 240. Valid "economic incentives" include "encourage[ing] apprenticeship programs to obtain state approval." *Id*. That is precisely what the RCOs do here. ERISA plans that choose to participate in federally- or state-approved apprenticeship programs will secure the economic incentive of not being disqualified from high-value bidding opportunities. If they choose not to participate in such a program, they are still free to work on private projects or public projects that fall below the RCOs' monetary threshold. Just as importantly, ERISA is not concerned with the technical—as opposed to the financial—aspects of apprenticeship programs, and the court will not interfere in this area traditionally within the purview of the states without a clear indication that that was Congress' intent.

The court also finds that the defendants here escape preemption under the market participant exception.[32] In the context of the National Labor Relations Act ("NLRA"), the Supreme Court has held:

> When we say that the NLRA pre-empts state law, we mean that the NLRA prevents a state from regulating within a protected zone, whether it be a zone protected and reserved for market freedom, or for N[ational Labor Relations Board] jurisdiction. A State does not regulate, however, simply by acting within one of these protected areas. When a State owns and manages property, for example, it must interact with private participants in the marketplace. In so doing, the State is not subject to pre-emption by the NLRA, because pre-emption doctrines apply only to state *regulation*.

*Building and Constr. Trades of Metro. Dist. v. Associated Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218, 226–27 (1993) (hereinafter "*Boston Harbor*") (internal citations omitted). The Third Circuit has recognized a two-step test to determine whether the market participant exception applies to a particular state action: "First, does the challenged funding condition serve to advance or preserve the state's proprietary interest in a project or transaction, as an investor, owner, or financier? Second, is the scope of the funding condition 'specifically tailored' to the proprietary interest?" *Hotel Emps. & Rest. Emps. Union, Local 57 v. Sage Hosp. Res., LLC*, 390 F.3d 206, 216 (3d Cir. 2004) (hereinafter "*Sage*") (citing *Boston Harbor*, 507 U.S. at 232).

The Third Circuit has not yet decided whether the market participant exception applies to ERISA preemption. *See Associated Builders and Contractors Inc. N.J. Chapter v. City of Jersey City*, 836 F.3d 412, 417 n.6 (3d Cir. 2016) ("We need not decide today whether the market participant exception limits ERISA preemption, for as we explain, the City does not act as a market participant in offering tax abatements." (citing *Keystone Chapter, Associated Builders & Contractors, Inc. v. Foley*, 37 F.3d 945, 955 n.15 (3d Cir. 1994)). However, other district courts

---

[32] The First Circuit did not address the market participant exception in *Quincy* because the defendant had not raised the issue in its summary judgment briefing. *See* 759 F.3d at 131.

in this circuit, as well as other circuit courts, have applied the exception to insulate a municipality from ERISA's preemptive reach where the municipality acts as a proprietor, rather than a regulator. *See Johnson v. Rancho Santiago Cmty. Coll. Dist.*, 623 F.3d 1011, 1023 (9th Cir. 2010) ("Because we conclude that the District acted as a market participant, the plaintiffs' ERISA and NLRA preemption claims fail at the threshold."); *Cardinal Towing & Auto Repair, Inc. v. City of Bedford*, 180 F.3d 686, 695 (5th Cir. 1999) ("Courts have had little difficulty finding that proprietary state action does not 'have the effect of law' under ERISA and thus does not fall within the terms of express preemption." (citing *Associated Gen. Contractors of Am. v. Metro. Water Dist. of S. Cal.*, 159 F.3d 1178, 1183 (9th Cir. 1998)); *New Castle Cty.*, 144 F. Supp. 3d at 639 ("[T]here can be no dispute that the Route 9 Library Project is funded by NCC; therefore, NCC has a proprietary interest in the project."); *Lott Constructors, Inc. v. Camden Cty. Bd. of Chosen Freeholders*, No. 93-5636 (JBS), 1994 WL 263851, at *20 (D.N.J. Jan. 31, 1994) (concluding that plaintiffs' ERISA preemption claim failed "because the challenged state action applie[d] only to the County's own public works projects and d[id] not attempt to require the use of union labor on any other projects undertaken in the County [and so] the County's activities are properly characterized as proprietary").

The plaintiffs argue that this court should depart from the path taken by all of those courts, and instead hold that the market participant exception does not apply in the ERISA context because ERISA, unlike the NLRA, includes a "broad preemption provision" that "supersede[s] any and all State laws insofar as they may now or hereafter ***relate to*** any employee benefit plan." Opp. to Mot. to Dismiss at 35 (quoting 29 U.S.C. § 1144(a)) (alteration in original). The plaintiffs cite to the Supreme Court's holding in *Pilot Life Ins. Co. v. Dedeaux* that ERISA's preemption provision is "deliberately expansive," but they take that language out of context: "We have observed in the

past that the express pre-emption provisions of ERISA are deliberately expansive, and designed to 'establish pension plan regulation as exclusively a federal concern.'" 481 U.S. 41, 45–46 (1987) (emphasis added) (quoting *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 523 (1981)). The instant matters do not involve pension plan regulation.

Moreover, *Pilot Life Ins. Co.* predates *Dillingham* by a decade. Although *Dillingham* recognized *Pilot Life Ins. Co.'s* "deliberately expansive" language, the Court also cautioned that "where federal law is said to bar state action in fields of traditional state regulation, ... we have worked on the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." 519 U.S. at 325 (omission in original) (citation omitted). The market participant exception recognizes "a presumption about Congress's purposes. In general, Congress intends to preempt only state regulation, and not actions a state takes as a market participant." *Johnson*, 623 F.3d at 1022 (citations omitted). This court agrees with the Ninth Circuit in *Johnson* and the many other courts that have used the same logic in holding that ERISA preemption is inapplicable under the market participant exception.

The plaintiffs next argue that, if the court holds the market participant exception applies, they are entitled to discovery to explore "whether Defendants are acting as market participants as opposed to market regulators with their enactments of the RCOs." Opp. to Mot. to Dismiss at 35. But discovery is wholly unnecessary to determine that the defendants were acting as proprietors here. Applying the *Sage* test, the court first asks whether the RCOs "serve to advance or preserve the [municipalities'] proprietary interest in a project or transaction, as an investor, owner, or

financier[.]" 390 F.3d at 216. That question is easily answered in the affirmative, because the RCOs explicitly only apply to public works financed by the defendants.[33]

Next, the court asks whether the RCOs are "specifically tailored" to the proprietary interest. *Id*. (citing *Boston Harbor*, 507 U.S. at 232). In *New Castle County*, the court held that the "crucial factor" in analyzing the specifically tailored requirement was "whether the [ordinance] requirements apply to every construction project in NCC or only to NCC's own projects." 144 F. Supp. 3d at 639; *cf. Sage*, 390 F.3d at 217 (holding that requirement was specifically tailored where it sought to protect city's proprietary interest in project and did not require employer to sign labor agreements extending to non-city projects). The plaintiffs point to a District of Massachusetts case to suggest that the RCOs are not "specifically tailored." Opp. to Mot. to Dismiss at 36 (citing *Util. Contractors Ass'n of New England, Inc. v. City of Fall River*, Civ. A. No. 10-10994-RWZ, 2011 WL 4710875 (D. Mass. Oct. 4, 2011). Unlike the defendants here, the City of Fall River imposed "sweeping" requirements on bidders, covering such areas as residency, health and welfare, and pension plan provisions. 2011 WL 4710875, at *1. Those requirements were so "[b]road and varied" that the court determined they were "tantamount to regulations." *Id*. at *8. The court also took issue with the fact that the city had not "describe[ed] the [] true purpose of these regulations—their relationship, if any, to market economics, and/or any pecuniary interests motivating their passage." *Id*. at *9.

The RCOs here, in contrast, are more like those upheld in *New Castle County* and *Sage*. By the plaintiffs' own admission, the RCOs themselves include an explicit purpose on their face:

---

[33] Perplexingly, the plaintiffs argue that Plymouth's statement in its motion to dismiss about the township's elected officials' duty to "spend Township resources responsibly and in a manner that guarantees the greatest return for their tax dollars" suggests that Plymouth was acting as a regulator, not a proprietor. Opp. to Mot. to Dismiss at 36–37. To the contrary, Plymouth's statement could not have been clearer that its concern was with projects that the township itself finances. *See, e.g.*, *New Castle Cty.*, 144 F. Supp. at 639 (holding that there "c[ould] be no dispute" that defendant acted as proprietor because it funded project).

to ensure that the contractors working on the municipality-funded projects are adequately trained and qualified. *See* Northampton Compl. at ¶ 15 ("The stated purpose of the [ordinance], i.e., to ensure that the [municipality] contracts with responsible construction contractors who employ qualified craft workers, is completely false and irrational."); Colonial Compl. at ¶ 15 (same); Plymouth Compl. at ¶ 14 (same); West Norriton Compl. at ¶ 14 (same). There is no suggestion that the RCOs apply to any contractors other than those seeking to contract with the respective municipality. Rather, the RCOs only serve to protect the defendants from the time, expense, and hassle that employing undertrained craftspeople on publicly-funded construction projects could cause. Any time an entity—public or private—undertakes a contracting project, that entity has an interest in the cost and quality of the project. Imposing minimum training requirements is a way to address those concerns. Thus, is passing the RCOs, the defendants do not behave any differently than any other market participant.

### E.    Pennsylvania Public Bidding Law

"[W]here, as here, all federal claims are dismissed or otherwise no longer viable before trial, the Court should decline to exercise jurisdiction over pendent state claims unless 'extraordinary circumstances' are present."[34] *ARA Servs., Inc. v. Sch. Dist. of Philadelphia*, 590 F. Supp. 622, 630 (E.D. Pa. 1984) (citing *Shaffer v. Bd. of Sch. Dirs. of the Albert Gallatin Area Sch.*

---

[34] The plaintiffs argue that they have standing to pursue their Pennsylvania public bidding law claims because they are seeking relief under the Declaratory Judgment Act. *See* Opp. to Mot. to Dismiss at 18. Regardless of the legal validity of that argument, the Declaratory Judgment Act does not create federal jurisdiction where it does not otherwise lie, so it is appropriate for the court not to consider the state law claims. *See* 28 U.S.C. § 2201 (granting federal court authority to issue declaratory relief "[i]n a case of actual controversy *within its jurisdiction* . . . ." (emphasis added)); *see also Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 674 (1950) (describing Declaratory Judgment Act as having "limited procedural purpose" (citation omitted)); *Stock W., Inc. v. Confederated Tribes of the Colville Reservation*, 873 F.2d 1221, 1225 (9th Cir. 1989) ("[Plaintiff] cites in its complaint the Declaratory Judgment Act, 28 U.S.C. § 2201, as a basis for jurisdiction. But this Act only creates a remedy and is not an independent basis for jurisdiction." (citation omitted)); *Mazzocoli v. Merit Mountainside LLC*, Civ. A. No. 12-2168, 2012 WL 4103883, at *8 (D.N.J. Sept. 17, 2012) (declining to exercise supplemental jurisdiction over state law claims and Declaratory Judgment Act claim where federal claims were dismissed because the Declaratory Judgment Act "does not provide an independent ground for federal subject matter jurisdiction" (citing *Exxon Corp. v. Hunt*, 683 F.2d 69, 73 (3d Cir. 1982)).

*Dist.*, 730 F.2d 910, 912 (3rd Cir. 1984); *Weaver v. Marine Bank*, 683 F.2d 744, 746 (3d Cir. 1982)). "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) (footnote omitted). If the court dismisses the federal claims before trial, "the state claims should be dismissed as well." *Id.* Thus, the court will not exercise pendent jurisdiction over the plaintiffs' Pennsylvania bidding law claims in the absence of a plausible federal cause of action.[35]

## IV.   DISCUSSION – MOTIONS TO STRIKE SCANDALOUS ALLEGATIONS

The defendants moved to strike portions of the amended complaints that they allege are "scandalous and impertinent," specifically in regard to the allegations that the defendants "ha[d] been influenced by corrupt labor union officials." Colonial Mem. at 11; *see also* Northampton Mem. at 35–36; Plymouth Mem. at 51–52; West Norriton Twp. Mem. at 9–10. Rule 12(f) of the Federal Rules of Civil Procedure allows the court to strike from a pleading "any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). The court agrees with the defendants' assertion that allegations of corruption, and even suggestions of criminality, "cast[] a derogatory light," on their subjects. *See Carone v. Whalen*, 121 F.R.D. 231, 233 (M.D. Pa. 1988). In particular, the court notes a serious concern as to those allegations relating to the one named individual in the complaints, Colonial School Board President Felix Raimondo. The court appreciates the seriousness of the allegations, especially considering the plaintiffs' inability at oral argument to provide any real source for them.

---

[35] There is no indication that there would be another independent basis for federal jurisdiction in this matter as, for example, the parties in each action would not be completely diverse for purposes of diversity jurisdiction under 28 U.S.C. § 1332.

Nonetheless, the court does not consider it necessary to strike those paragraphs from the complaints. "[T]he standard for striking under Rule 12(f) is strict and [] only allegations that are so unrelated to plaintiffs' claims as to be unworthy of any consideration should be stricken." *Becker v. Chicago Title Ins. Co.*, No. Civ. A. 03-2292, 2004 WL 228672, at *6 (E.D. Pa. Feb. 4, 2004) (citation and internal quotation marks). Motions to strike "are not favored and usually will be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues in the case." *Giuliani v. Polysciences, Inc.*, 275 F. Supp. 3d 564, 572 (E.D. Pa. 2017) (citation and internal quotation marks omitted).

Although the plaintiffs' allegations concerning "corrupt union bosses" were insufficient to make out a claim under the Equal Protection and Due Process Clauses because rational basis review allows the court to consider any conceivable basis for the legislation, the court cannot conclude that the allegations "have no possible relation" to the amended complaints. The plaintiffs attempted to use those allegations to illustrate that the RCOs lacked any rational basis and were instead a pretext for economic protectionism. *See* Opp. to Mot. to Dismiss at 10 ("The RCO[s]' desire to privilege certain businesses (union contractors) over others (merit-shop contractors) at the expense of taxpayers is not a legitimate governmental purpose and cannot survive rational basis review."). The court ultimately finds that argument unpersuasive for the reasons discussed above, but that does not mean that the allegations were totally irrelevant for purposes of a motion to strike. Thus, although the court is sympathetic to the plaintiffs' arguments, particularly as to President Raimondo, the facts here do not meet the strict standard necessary to grant a motion to strike. Accordingly, the court will deny the requests to strike.

# V. CONCLUSION

The plaintiffs ask this court to infer from a potential disparate impact from policies that have not yet been used that elected officials across Northampton and Montgomery counties have been engaged in a widespread conspiracy of back-door dealing meant to target their businesses in favor of unionized alternatives. The court declines to do so. The plaintiffs argue that the defendant municipalities should be forced to undergo the burden and expense of extensive discovery based on the conclusory allegations that a facially-neutral policy is meant to protect an interest that appears nowhere in the publicly-available legislative history or the law itself. The Constitution requires no such result. For even if it was true that the defendants intended to benefit unions at the plaintiffs' expense, their claims still fail as a matter of law, because they have not refuted the existence of a conceivable rational basis for the RCOs.

In large part, rational basis review is so favorable to the government because it "preserve[s] to the legislative branch its rightful independence and its ability to function." *Beach Commc'ns*, 508 U.S. at 315 (citation and internal quotation marks omitted). Those concerns are even more salient when the court is asked to interfere with the judgment of a state or local legislature. The plaintiffs here assert several policy arguments for why an alternative piece of legislation would have been superior to the RCOs. But this court will not—and, indeed, cannot—substitute its own (or the plaintiffs') judgment for the legislators', even if there is a wiser alternative that may better satisfy the municipalities' purpose. Perhaps an ordinance that, as the plaintiffs suggest, requires bidding contractors' employees to have graduated from a qualifying apprenticeship program or that creates an exception for contractors without a qualifying apprenticeship program to demonstrate that their employees are nonetheless adequately trained would better meet the RCOs'

stated purposes. But the court could not so conclude without impermissibly interfering in the proper province of the state and the legislature.

That said, the plaintiffs are not remediless. It is too soon to tell how effectively the RCOs will achieve their intended purpose of identifying responsible contractors for public jobs, and Mr. Basu certainly provides a parade of horribles as to their possible results. But regardless, that is not for the court to answer. *See Feeney*, 442 U.S. at 272 ("The calculus of effects, the manner in which a particular law reverberates in a society, is a legislative and not a judicial responsibility." (citations omitted)). If the plaintiffs are, in fact, correct and the RCOs ultimately do not serve the public welfare as effectively as an alternative policy would, their solution is at the ballot box, not the courthouse.

Accordingly, the court will grant the defendants' motions to dismiss to the extent that they seek dismissal of the plaintiffs' claims with prejudice for (1) violations of the Equal Protection and Due Process Clauses, and (2) declaratory relief under ERISA.[36] With the dismissal of these potential federal claims, the court lacks an independent basis to retain jurisdiction over the remaining state-law claims and declines to exercise supplemental jurisdiction over those claims. The court will also deny the motions to strike under Rule 12(f).

The court will enter a separate order.

BY THE COURT:


 _/s/ Edward G. Smith_
EDWARD G. SMITH, J.

---

[36] The plaintiffs have not suggested that the court should provide them with yet another opportunity to amend their complaints and, as otherwise explained in this opinion, the court finds that allowing the plaintiffs such an opportunity would be futile.